JAMES GORE

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Mt. Vernon June 12, 1896.*

1. RECORD—*in criminal case—power of court to permit amendment.* A trial court has power to permit the record in a criminal case to be amended, on application by the State's attorney, so as to show the return of the indictment into open court by the grand jury in a body, where the facts in the record are sufficient by which to amend.

2. CRIMINAL LAW—*conviction may be had upon confessions of accused.* Where the *corpus delicti* is established independently of the admissions or confessions of the accused, admissions or confessions freely and voluntarily made may be sufficient on which to convict.

3. SAME—*examination of witnesses whose names are not endorsed on indictment.* It is discretionary with the court, in a criminal case, to allow the examination of witnesses whose names are not endorsed on the indictment, and the exercise of such discretion can not be assigned for error.

4. SAME—*proof of confession of crimes other than that charged—when not error.* Confession by the accused of a crime other than that charged in the indictment, while not admissible as a substantive fact, may, when not separable from a competent confession, go to the jury, under cautionary directions from the court.

WRIT OF ERROR to the Circuit Court of Johnson county; the Hon. A. K. VICKERS, Judge, presiding.

SPANN & SHERIDAN, for plaintiff in error.

MAURICE T. MOLONEY, Attorney General, (T. J. SCOFIELD and M. L. NEWELL, of counsel,) and GEORGE B. GILLESPIE, State's Attorney, for the People.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

James Gore was indicted for the murder of John Scarlett, at the March term, 1894, of the circuit court of Johnson county. The murder was alleged to have been committed in September, 1890. A trial was had in June, 1894, which resulted in a verdict of guilty, and the pun-

ishment of defendant was fixed at imprisonment in the penitentiary for the term of thirty years. Defendant sued out of this court a writ of error to the November term, 1894, and by his assignment of errors raised the question whether the record showed the indictment was returned by the grand jury, in a body, into open court. Upon suggestion of diminution of the record and motion of the Attorney General a *certiorari* was allowed at that term. At the May term, 1895, the cause was continued on motion of plaintiff in error. At the March term, 1895, of the circuit court of Johnson county, the cause of *The People of the State of Illinois* v. *James Gore* was placed on the docket of the circuit court of Johnson county, and motion entered to amend the record showing the return of the indictment into open court by the grand jury in a body. Due notice had been given of this motion, and at that term such proceedings were had that the record was amended *nunc pro tunc,* showing the return of the indictment into open court by the grand jury in a body, to which the defendant excepted and presented his bill of exceptions, and afterward sued out a writ of error from this court on this latter record. That record being brought to this court, an order was entered consolidating the two cases.

Where there is a clerical error or misprision of the clerk an amendment of the record may be had. The record may also be amended whenever there is any memoranda or record by which to amend. The fact that the grand jury, as a body, made a report and returned into open court certain indictments, which were properly indorsed as true bills and filed and placed on the docket, was shown by the record, and this indictment, properly indorsed and filed and placed on the docket with other cases returned at the same time, is also shown by the record. We are of opinion the facts of record were sufficient to amend by, and such fact being shown, the trial court had power to permit the record to be amended,

upon a proper application by the State's attorney. *May* v. *People*, 92 Ill. 343; *Kennedy* v. *People*, 44 id. 2?3.

The facts shown by the record are in substance as follows: On Saturday, the closing day of the Johnson county fair, about two o'clock in the afternoon, in the year 1890, a boy by the name of Johnson was crossing a meadow which lies adjacent to the fair grounds in Vienna, and near a path, with face inclined towards the west, lying nearly on its back, he found the body of the deceased, John Scarlett. He passed on, and no alarm was given until about four o'clock in the afternoon, when August Bieterich, a man with whom the boy was working and to whom he had made known that he had found the deceased, informed the civil authorities. When examined it was found that the deceased had been shot in the head, some three inches above the right ear. His hat was found just north of his head, and some letters belonging to him were found scattered about. No money or pocketbook was found on his person or about the body. The pale-blue ribbon he had been using as a watch-guard for a silver watch which he carried had been cut in two, leaving a piece of it attached to his vest, and his watch was gone. No weapon or article of value was found about his body, and there were no appearances of a struggle on the ground. A few cartridges, some small keys, a small looking-glass and some other articles were found in his pockets or near the body. A coroner's jury was organized, some ill-advised arrests were made, and after several days' fruitless inquiry the whole matter was given up, with the conclusion that John Scarlett's murder would probably remain a mystery.

Defendant, James Gore, lived some four miles west of Vienna, on a farm adjacent to the farm of one W. R. Gore, known as "Buck" Gore, a relative of his. Between the residence of the defendant and Buck Gore's residence was a small creek, with no bridge over it. Near the creek on the side next to Buck Gore's lived Woodson

Turner. This was the situation of the parties on Christmas eve following the murder. About eight or nine o'clock that night defendant came to the home of Buck Gore somewhat under the influence of liquor, riding or leading a mule, and carrying a jug of whisky and a baker's jelly-roll. After recounting to Buck Gore and his family various crimes he had committed, such as stealing cattle, hogs and horses, he declared he knew who killed John Scarlett. Buck Gore then admonished him not to tell him anything about it, and reminded him that on a previous occasion defendant had confessed a crime to him and that he was made a witness against defendant on the trial of the charge. Notwithstanding this, defendant said that he, Bent Gore and John Martin killed John Scarlett; that Bent Gore enticed him from the bakery where he was at work and they took him across the north iron bridge into the meadow adjoining the fair grounds, where they killed him for his money, and that they drugged him at Bent Gore's stand before they killed him; that they thought he had about $250, but they only got $85, a watch and a pistol; that his watch was fastened to his vest by a blue ribbon; that Bent Gore shot him, and they cut the ribbon and took the watch and his money and pistol, and Martin carried the watch away with him. He also stated to Buck Gore that as they were crossing the iron bridge they heard some one coming, and he jumped across a ditch and hurt his arm. After defendant had this conversation, about ten o'clock at night he left Buck Gore's and started home, but it had been raining, and, finding the creek swollen, he called at Woodson Turner's residence and stayed all night. He was still under the influence of liquor and chose to sleep on the floor. The Scarlett matter was re-told to Turner, defendant repeating what he had told Buck Gore and his family, and cautioned Turner not to divulge his secret, threatening that should Turner prove faithless his fate should be the same as Scarlett's. On the morning fol-

lowing, defendant arose early, sober and perfectly self-possessed, and as he started away, after breakfast and much friendly conversation, he reminded Turner of what he had told him on the previous night and again threatened to kill him if he ever revealed the defendant's secret. On Tuesday following, Buck Gore again saw defendant, and asked him if he talked to everybody as he had to him and his family when at his house on Christmas eve. Defendant asked Buck what he said, and on being informed, denied that he had killed Scarlett, and told Buck for God's sake not to tell it, for if what he had said should get out he would be hung. In the summer following, defendant told Tom Gore that he, Bent Gore and John Martin killed John Scarlett.

In November, 1893, Buck Gore made known to the State's attorney of Johnson county the confession defendant had made to him and his wife and daughter and son Tom, and went again to see defendant and endeavored to learn something further from him about the Scarlett murder. Defendant at that time confirmed what he had previously stated to the witness, Buck Gore, about the Scarlett killing, and offered to take him in as a partner in stealing and counterfeiting. In the early part of 1891 William Rogers was living on defendant's farm and defendant was boarding with Rogers. One evening Rogers and his wife and defendant were sitting by the fire. Nothing was being said, when defendant broke the quiet with the query, "Bill, what do you think ought to be done with the man that killed Scarlett?" Rogers replied, "I think he ought to be hung." Nothing further was said.

Bent Gore and John Martin both attended the fair in 1890. Martin was a race-rider and Bent Gore was the keeper of a stand outside the grounds. Bent Gore claimed that he was not on the grounds until Saturday night; that on the night of the alleged murder he stayed by himself at his home near Bloomfield, some four miles away; that he got back rather late in the morning on

Saturday. Other witnesses say he was on the fair grounds on Friday night at eleven o'clock. Defendant told Woodson Turner and Buck Gore that he intended to stay on the fair grounds on Friday night and have some fun, and on the following day they and Brownlow Sturdivant noticed that he, defendant, was carrying his arm in a sling, and he claimed he got it hurt the night before.

Scarlett was called away from the bakery by some one. He and a man, whom Monroe Simmons identifies as Bent Gore, went to Simmon's drug store and bought some article on Thursday night, and then proceeded down the street towards the fair grounds. Shortly afterwards the deceased and Lum Verhines met Monroe Holcomb, who tried to borrow Scarlett's pistol. Scarlett refused to loan it to him, saying he was going to be out that night, and while they were talking Scarlett was called into a dark alley by two or three men. He did not return to his work the following morning, neither did he go to his washerwoman to get his clothes that night, as he had promised to do. He was seen on the fair grounds the following day. Thomas and Tapley, two witnesses who were not at the fair prior to Friday, say he was drinking and seemed absent-minded. A man was seen in the field where deceased was found, late in the afternoon on Friday, who appeared to be sick or drunk, and was attended by two other persons. Tapley saw and heard a pistol shot about where the deceased was found, Friday evening late. Under the sidewalk near the stand of Bent Gore, shortly after the fair of 1890, a boy, Harry Carter, found a pistol where it had been secreted. On Friday afternoon, near Bent Gore's stand, a man of the description of the deceased approached the witness Eli Short and offered to buy his mules and pay him $250 for them. When Scarlett was killed it was known that he had about $85 in money, and no money was found on his person.

This is substantially the evidence on which defendant was convicted. From this evidence it clearly appears

John Scarlett was feloniously killed. "The proof of the charge in criminal cases involves the proof of two distinct propositions: First, that the act itself was done; and secondly, that it was done by the person charged, and none other,—in other words, proof of the *corpus delicti* and of the identity of the prisoner." (3 Greenleaf on Evidence, sec. 30.) The deceased, shortly prior to his death, was known to be in possession of money and a watch. His body was found, with money and watch missing, and his papers, keys, pocket knife and pencil out of his pockets and scattered around. A bullet hole in his head was shown to be the cause of his death. These facts were sufficient to authorize the verdict as to the *corpus delicti.* The *corpus delicti* cannot be proven by confession or admission alone    *Williams* v. *People,* 101 Ill. 382; *May* v. *People, supra; People* v. *Hennesy,* 15 Wend. 147; *People* v. *Badgley,* 16 id. 53.

Where the crime is thus clearly shown, independently of admissions or confessions, to have been committed by some person, then admissions or confessions freely or voluntarily made may be sufficient to convict. *Bergen* v. *People,* 17 Ill. 427; *Yoe* v. *People,* 49 id. 410; *Anthony* v. *State,* 5 Am. Crim. Rep. 443; *Andrews* v. *People,* 117 Ill. 195; *Cook* v. *State,* 56 Am. Dec. 410.

Objection is made that the State's attorney was permitted to call witnesses other than those originally endorsed on the indictment. It appears defendant was furnished with a copy of the indictment and a list of witnesses. Subsequently the State's attorney gave notice to defendant of a motion for leave to endorse other witnesses, which was allowed. Still at a later period the State's attorney gave defendant notice that he would call still other witnesses. Defendant had notice of the witnesses who would be called. Aside from this, it is within the sound discretion of the court to allow witnesses to be examined whose names are not so endorsed on the indictment, and the exercise of that discretion

cannot be assigned as error. *Gardner* v. *People,* 3 Scam. 83; *Gates* v. *People,* 14 Ill. 433; *Perteet* v. *People,* 70 id. 171; *Smith* v. *People,* 74 id. 144; *Logg* v. *People,* 92 id. 598; *Bulliner* v. *People,* 95 id. 394; *Andrews* v. *People, supra.*

Objection was made to the admission of evidence showing defendant made statements as to the commission by him of other crimes than that for which he was on trial. Evidence of confession of other crimes is not admissible as a substantive fact. But it appears when the confession by defendant as to the crime charged was made he also admitted in the same conversation that he had committed the other crimes referred to; and when the witness was called upon to give defendant's confession he stated all defendant said at that time as a part of an inseparable admission or confession. The court correctly instructed the jury as to the purpose for which such statements were admitted, and cautioned them not to consider the statements as to other crimes as evidence of the commission of the crime charged.

Without entering into a consideration of the great number of instructions in this record, which would extend this opinion to an undue extent, it is sufficient to say they are in accordance with what is here said.

The defendant had a fair trial, and we find no error of law which is sufficient to authorize a reversal of the judgment in this case. In the absence of errors of law the court will not set aside a verdict unless it is manifestly erroneous. *Wilson* v. *People,* 26 Ill. 434; *Bromley* v. *People,* 27 id. 20; *McMahon* v. *People,* 120 id. 581.

The judgment of the circuit court of Johnson county is affirmed.             *Judgment affirmed.*