THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ANDREW WILLIAMS, Plaintiff in Error.

*Opinion filed June 16, 1909.*

1. MURDER—*whether evidence raises reasonable doubt of guilt is for the jury.* Whether the evidence favorable to the accused is sufficient to raise a reasonable doubt of his guilt is a question peculiarly within the province of the jury, and its determination against the accused will not be interfered with by the Supreme Court unless it is clear from all the evidence that there is a reasonable doubt of guilt.

2. SAME—*what action with respect to alleged dying declaration is not harmful.* Permitting the prosecution to make certain proof preparatory to introducing in evidence an alleged dying declaration which the court subsequently refuses to admit in evidence is not harmful to the accused, where no part of the declaration was read to the jury and the proof made merely showed that the deceased had said she was about to die and wished to make a statement, and that a written statement was made and signed by her.

3. SAME—*action in permitting witnesses not noted on indictment to testify cannot be assigned as error.* It is within the discretion of the court to allow witnesses to testify whose names are not endorsed on the indictment, and the exercise of that discretion cannot be assigned as error.

4. SAME—*a jury need not be instructed to consider intelligence and experience of the accused.* An instruction upon the subject of self-defense need not direct the jury to take into account the intelligence and experience of the accused in determining whether the circumstances which induced his fear of bodily harm were such as would have induced the fear of a reasonable person.

5. SAME—*fear which a person may act upon is fear of a reasonable person.* The fear which a person may act upon in taking the life of his assailant is the fear of a reasonable person excited

by the circumstances surrounding him at the time, and if, acting under the influence of such fear, he does what a reasonable person might have done under the circumstances he will be justified.

6. SAME—*antecedent threats do not justify an assault.* Antecedent threats do not justify an assault by the person against whom they are made, but they are proper to be considered in connection with the acts, at the time of the assault, of the person who made such threats.

7. SAME—*when erroneous instruction will not reverse.* Where the only question presented to the jury in a murder trial is that of self-defense, and the cause of the death of the deceased is not denied, the giving of an instruction authorizing a conviction if the accused, with malice aforethought, made an assault upon the deceased with a deadly weapon and not in self-defense, is not ground for reversal, though it fails to require the jury to find that the death resulted from the assault.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE KERSTEN, Judge, presiding.

The plaintiff in error was convicted in the criminal court of Cook county of the murder of Ophelia Williams, his wife, and his punishment was fixed at death. This writ of error is prosecuted to reverse the conviction.

The plaintiff in error and his wife, whose maiden name was Hardy, were colored people. They were married in October, 1905, when she was eighteen years old and had only been a week out of school. He was twenty-two years old at the time of the trial, in July, 1908. A child was born to them about a year after the marriage. Her father, John W. Hardy, was a police officer of the city of Chicago and lived with his wife on the north side of Fifty-ninth street, in that city, between Loomis street on the west and Ada street on the east. The plaintiff in error was a laborer, working at different occupations and having no steady employment. After the marriage he lived for a month with his wife at his sister's and then kept house for a few months, after which they went to his wife's parents' home and lived there for a year or more, the plaintiff in

error paying for their room and food when he had work. Afterward they left Hardy's home and went for a time to his sister's, but they soon separated and she returned to her father's house, the plaintiff in error staying at his sister's. The wife swore out a warrant for his arrest on a charge of abandonment. He was arrested by her father, but she declined to appear against him and the complaint was dismissed. They then lived together for several months, but in December, 1907, he was without work and she returned to her parents while he went to his sister's house. On the morning of March 10, 1908, the plaintiff in error went to the house where his wife was living, and seeing Mrs. Hardy, her mother, standing at an up-stairs window, asked her to tell Ophelia (his wife) to come down and bring the baby with her. Ophelia came down with the baby in her arms and stood in the open door at the foot of the stairs in the hall. Within a few moments of her arrival in that position she was shot three times and fatally wounded, and a fight with revolvers took place between her father and her husband, in which both were wounded. She was removed to a bed-room up-stairs and afterward to a hospital, where she died late in the afternoon.

Mrs. Hardy testified that she was standing in the up-stairs bay window, looking down upon the doorway, when her daughter and the plaintiff in error met, and that he stepped up and stooped as if to kiss the baby, and as he did so he fired. The witness did not see the weapon, but Ophelia fell in the door and the baby on the sidewalk outside. The plaintiff in error fired a second shot at his wife and one at the baby lying on the sidewalk. The witness ran down-stairs behind her husband, picked up the child, whose cheek and hair were blackened and singed, and got her daughter up-stairs on the bed.

John W. Hardy, the father, testified that he was at the telephone and had no knowledge that the plaintiff in error was in the neighborhood, when he heard three shots fired

and the scream of a woman. He ran into his bed-room, seized his revolver and ran down the stairs. He saw his daughter lying in the hall and the baby outside. The plaintiff in error fired at him and he leaped over the bodies lying there and began firing at the plaintiff in error, who turned and ran west. Hardy was unable to catch him and came back and helped get his daughter up-stairs and on the bed. Meanwhile the plaintiff in error, having stopped and reloaded his revolver, came back to the hall door. The two met there and began firing at the same time. Both were wounded. The plaintiff in error went off across the street and Hardy went to the telephone.

The plaintiff in error was arrested a few minutes after the occurrence, in a shed on an alley three or four blocks from the scene, and was brought to the bed-room where his wife was lying. Several witnesses there present testify that she stated there in his presence that he was her husband and that he had shot her. He said nothing to her. Several officers testify that on his way to the station, and at the station, in response to the question why he had shot his wife, he answered because she would not live with him.

The plaintiff in error testified that his wife came down with the baby and they were standing there about half an hour talking about the work she was going to get. Her father came to the door and called to her to come up-stairs and get ready to go down town. She said, "All right," and he said, "Andrew, I don't want you around my house; I want you to go away." The plaintiff in error stood there, and Hardy said, "You ain't going, are you? You will go,"—using a vile epithet and reaching in his pocket for his gun. Thereupon plaintiff in error shot him. Ophelia turned, saying, "Papa, please don't kill him," and five shots on each side were exchanged between the plaintiff in error and Hardy, the plaintiff in error being hit twice. If he hit his wife she was shot accidentally. The plaintiff in error also testified that the Sunday after his marriage Mrs. Hardy

warned him to keep out of her husband's way because the latter said he was going to kill the plaintiff in error the first opportunity he got, and she repeated the warning substantially about a year before the homicide. His wife said to him when he got out of jail after his arrest for abandonment that her father said he was going to kill him the first opportunity he got, and that he said he ought to have taken him out on the prairie the day he arrested him and killed him then, the same as a dog, and no one would have known it. The plaintiff in error further stated that he got scared of Hardy, and for that reason he had the gun when this trouble occurred, because Hardy threatened to kill him. The sister of the plaintiff in error, Mrs. Brown, testified to hearing his wife say that her father said he ought to have shot Andrew and left him lying out on the commons and no one would have ever known it. There was no other material evidence for the defendant except four witnesses, one of whom was another sister, to his general reputation for being a peaceable and law-abiding citizen.

Mrs. Hardy denied the warning against her husband testified to by the plaintiff in error and denied hearing any threats of her husband against the plaintiff in error. Mr. Hardy denied making any threats against the plaintiff in error. He testified that he had met him a dozen times since August, when the last threats were claimed to have been made, and many times after December, when the wife of the plaintiff in error returned to her father's house. Another witness testified to Hardy and the plaintiff in error meeting three or four times since January.

STEDMAN & SOELKE, and ARTHUR J. SHUTAN, for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN E. W. WAYMAN, State's Attorney, (JUNE C. SMITH, and BENEDICT J. SHORT, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

The record contains evidence amply sufficient to sustain the verdict. No other conclusion than that of the guilt of the plaintiff in error could be reached if the evidence of the prosecution alone be considered. The jury were not bound to accept the account of the transaction given by the plaintiff in error and disregard that of the witnesses for the prosecution. To determine the facts and the credibility of the various witnesses is the special function of the jury. Whether the evidence favorable to the defense was sufficient to raise a reasonable doubt of the guilt of the plaintiff in error was a question of fact peculiarly within the province of the jury to determine. This court will not interfere with that determination except where it clearly appears, from a consideration of all the evidence, that there is a reasonable doubt of the defendant's guilt. *Gainey* v. *People,* 97 Ill. 270; *Henry* v. *People,* 198 id. 162; *People* v. *Deluce,* 237 id. 541.

During the progress of the trial an effort was made on the part of the prosecution to introduce in evidence a writing claimed to be a dying declaration of the deceased. Evidence was heard in the absence of the jury from which the court determined that the writing was admissible, and upon the return of the jury some evidence was offered of the circumstances under which the writing was prepared and signed, but the court finally determined that the writing was incompetent and excluded it. No part of it was read to the jury and they received no information in regard to it, except that the deceased said she was about to die and wished to make a statement and a written statement was made and signed by her. They knew that the court held it to be incompetent as evidence and they knew no part of its contents. No harm came to the plaintiff in error by the action of the court in this particular.

Several witnesses testified for the prosecution whose names were not endorsed upon the indictment, and the

plaintiff in error objected to their examination for that reason. It is within the discretion of the court to allow witnesses to testify whose names are not endorsed on the indictment, and the exercise of that discretion cannot be assigned as error. *Gore* v. *People,* 162 Ill. 259; *Hauser* v. *People,* 210 id. 253.

The third instruction given at the request of the People was as follows:

"The court instructs the jury that no threats or menaces made by John W. Hardy against the defendant, Andrew Williams, can avail said defendant unless at the time he made the assault alleged in the indictment he was actually assailed or had sufficient evidence to convince any reasonable person like situated that he was in danger of receiving great bodily injury or of losing his life at the hands of the said John W. Hardy. Whatever threats may have been made by the said John W. Hardy, if any were made, cannot be of avail to the defendant unless at the time of the assault something was done by said John W. Hardy that would induce a reasonable man like situated to suppose that he was in danger of receiving great bodily harm or his life. All antecedent threats, if any were made, are dependent upon the facts at the time of the assault, and in order to justify the assault it must appear that at the time it was committed there was some action which would induce a reasonable man to believe that he was in danger of great bodily harm or of losing his life."

This instruction is said to have been erroneously given because it assumes that the plaintiff in error made the assault; because it fails to take into account the intelligence and experience of the plaintiff in error in announcing that he must have sufficient evidence to convince any reasonable person like situated that he was in danger of receiving great bodily harm; because the use of the word "convince" required too high a degree of evidence for the justification of the plaintiff in error; and because it states that ante-

cedent threats are dependent upon the facts at the time of the assault. An instruction so carelessly written ought not to have been asked and might better have been refused. In this case, however, we do not think the jury could have been misled by it. There is no question that an assault occurred, that the plaintiff in error took part in the affray and that he fired the first shot in it. He says so himself. The instruction was intended to inform the jury as to the right of the plaintiff in error to defend himself against apprehended danger and of the effect of previous threats against him. It did so awkwardly and incompletely but without substantial error when the other instructions in the case are read in connection with it. It was not necessary to direct the jury, in this instruction, to take into consideration the intelligence and experience of the plaintiff in error. The fear under the influence of which a person may take the life of his assailant is the fear of a reasonable person excited by the circumstances surrounding him at the time. If, acting under the influence of such fears, he does what a reasonable person might have done under the circumstances he will be justified. The word "convince" was too strong a word to use as it was used in the instruction. The term used at another place, "induce to suppose," expresses the right meaning. In view of the full information on the subject given to the jury in instructions 4 and 52 for the plaintiff in error there could have been no misunderstanding in this particular. The idea sought to be conveyed in regard to antecedent threats was, that they could only be considered in connection with some action at the time of the affray. By themselves they could not justify an assault, but they were proper to consider in connection with the acts, at the time of the assault, of the person making them. The jury would so understand this part of the instruction, and so understood it is correct.

It is objected to instruction 21 that it assumes that the death of Ophelia Williams was caused by a wound inflicted

by the plaintiff in error, but when the whole instruction is read together it contains no such assumption.

Instructions numbered 22, 31, 32, 33, 34, 35 and 36 deal with the subject of self-defense against apparent danger and are criticised because it is said they require that the apparent danger referred to should be such as was apparent to the jurors from the evidence at the trial, and not such as might have been apparent to the plaintiff in error at the time of the affray. We do not think the instructions have that meaning, but if they were doubtful they are made certain by other instructions given which told the jury that actual and positive danger is not indispensable to justify self-defense; that if the circumstances induced in the mind of the defendant a reasonable and well grounded belief that he was in danger of losing his life or suffering great bodily harm then he was justified in shooting; that a man threatened with danger must judge from appearances as to the actual state of things, and if he acts from honest conviction, induced by reasonable evidence, he will not be held responsible, criminally, for a mistake as to the extent of the actual danger, and that his right of self-defense is the same in apparent as in actual danger.

Instruction No. 29 told the jury that if the plaintiff in error, with malice aforethought, made an assault with a deadly weapon upon Ophelia Williams, in manner and form as charged in the indictment, not in self-defense, they should find him guilty. This instruction was erroneous because it did not require the jury to find that the death of Ophelia Williams resulted from the assault. There is, however, no possible doubt as to the cause of Ophelia Williams' death. She died from the wound she received. If the plaintiff in error made the assault upon her as stated in the hypothesis of the instruction, she did die as the result of it. The only question presented to the jury was the claim of self-defense. If the shooting occurred, as claimed by the plaintiff in error, in his justifiable self-defense he

was not guilty; if it did not so occur he was guilty. Every phase of the case bearing on that issue was presented to the jury. They were fully instructed in regard to it. The issue was fairly tried, and the conclusion reached ought not to be disturbed because of an erroneous instruction which could not have affected the result.

It is urged that the court erroneously refused to give to the jury the ninth, tenth and fourteenth instructions asked by the plaintiff in error. The ninth was properly refused because there is no basis for it in the record, and the fourteenth because it is included in the People's twentieth given instruction. The tenth instruction was condemned in *Tri-City Railway Co.* v. *Gould,* 217 Ill. 317, and *Johnson* v. *Farrell,* 215 id. 542.

We find no error in the record for which the judgment should be reversed. It will therefore be affirmed.

The clerk of this court is directed to enter an order fixing the period between nine o'clock A. M. and five o'clock P. M. of the 22d day of October, A. D. 1909, as the time when the original sentence of death entered in the criminal court shall be executed. A certified copy of that order will be furnished by the clerk to the sheriff of Cook county.

*Judgment affirmed.*