THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN HENRY STROSNIDER, Plaintiff in Error.

*Opinion filed June 16, 1914—Rehearing denied October 7, 1914.*

1. CRIMINAL LAW—*when refusal to dismiss proceeding because extradition was for another offense is proper.* Refusal to dismiss a criminal prosecution for the confidence game after a *nolle prosequi* as to the count charging larceny has been entered is proper, even though the accused claims he was extradited for larceny and that there was no provision authorizing extradition for the confidence game, where, from all that is shown by the record, the accused may have been found and arrested in the United States, the record merely showing an application by the State's attorney to the Governor and a petition by the Governor to the Secretary of State of the United States.

2. SAME—*permitting private attorney to assist prosecution is within sound discretion of court.* Permitting an attorney to act as special counsel to assist in the prosecution of a criminal case, even though he may be paid by private persons, is within the discretion of the trial court and is not ground for reversing the judgment of conviction, where it does not appear that the accused was prejudiced thereby by reason of any overmatching of his own counsel.

3. SAME—*the corpus delicti may be proved by circumstantial evidence.* While it is necessary, in a confidence game prosecution, to prove the falsity of the representations which were made to induce the victim to part with his money, in order to establish the *corpus delicti* of the crime, yet it is not necessary to prove such fact by direct evidence, and it is sufficient if the circumstances proven fully warrant the jury in believing such representations were false and no attempt is made by the accused to explain them.

4. SAME—*fact that accused has taken part in a similar confidence game may be proved.* In a prosecution for the confidence game it is not error, for the purpose of showing guilty knowledge by the accused, to permit a witness to tell of a previous transaction in which the accused, by a scheme similar to the one for which he is on trial, obtained a large sum of money from the witness.

5. SAME—*witnesses whose names are not upon the indictment may testify.* The court, in its discretion, may permit witnesses to testify whose names are not on the indictment, and such action will not be held ground for reversal where the accused was not taken by surprise or prejudiced in any way in making his defense.

6. SAME—*when a refusal to admit competent evidence is not ground for reversal.* Refusal to admit competent evidence, which, if believed, would have tended to discredit the testimony of the principal witness for the accused with reference to a certain part of his testimony, is not ground for reversal, where the material parts of his testimony are confirmed in so many particulars by other witnesses that the jury, in the absence of any evidence on the part of the accused, was bound to return a verdict of guilty.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

FRANCIS WILSON, and ARTHUR C. BACHRACH, (BENJAMIN C. BACHRACH, of counsel,) for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, and ARTHUR R. ROY, (HENRY A. BERGER, and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE COOKE delivered the opinion of the court:

Plaintiff in error, John Henry Strosnider, was on July 3, 1913, by the verdict of a jury in the criminal court of Cook county, found guilty of obtaining money by means

of the confidence game. He has sued out this writ of error to reverse the judgment rendered upon that verdict.

The indictment under which Strosnider was tried was returned against him and John D. Snarley, Daniel F. Kinnally and Charles Kissell, jointly. It consisted of two counts. The first count charged that the defendants, on October 29, 1912, obtained from William T. Kirby $20,000 by means of the confidence game, and the second count charged the defendants with the larceny of $20,000 from Kirby. Kissell was not apprehended. The other defendants, upon being arraigned, pleaded not guilty. At the close of the People's case the court directed verdicts of not guilty as to Snarley and Kinnally, and upon motion of the State's attorney entered a *nolle prosequi* as to the second count of the indictment charging the defendants with larceny. Thereupon Strosnider moved the court to dismiss the proceeding on the ground that he had been extradited from the Dominion of Canada on a charge of larceny, and because the treaties between the United States and Great Britain do not provide for the extradition from territory under the jurisdiction of Great Britain of one charged with obtaining money by means of the confidence game. The court denied the motion and permitted the trial to proceed under the count charging Strosnider with obtaining money by means of the confidence game, and this action of the court is one of the grounds urged for reversal.

The only evidence offered in support of this motion was a certified copy of an application by the State's attorney of Cook county to the Governor of this State, and a certified copy of a petition from the Governor to the Secretary of State at Washington, for the extradition of Strosnider. It was not shown that any action was taken by the Federal government upon the petition of the Governor, nor that any request was made to the Canadian government for the surrender of plaintiff in error to the United States government. So far as appears from any proof contained in

the record in this case, Strosnider may have been found
and arrested within the United States, rendering it unnec-
essary for the Federal government to take any action upon
the petition of the Governor. After the evidence above re-
ferred to had been offered, a colloquy occurred between
the State's attorney and the attorney for plaintiff in error,
in which the former insisted that plaintiff in error waived
examination and came to this country voluntarily, while the
attorney for plaintiff in error insisted that such was not
the case, but that, on the contrary, plaintiff in error was
extradited. This controversy between the attorneys was
not settled by proof, stipulation or otherwise and added
nothing to the proof which had been made, unless it can be
said that in this colloquy the State's attorney admitted that
plaintiff in error was arrested in Canada. The fact re-
mains, however, that the record fails to show that plaintiff
in error was surrendered to the United States government
by the Canadian government in compliance with a request
by the former for the extradition of plaintiff in error, and
the motion of plaintiff in error to dismiss the proceeding
was therefore properly denied.

Prior to the trial, upon motion of the State's attorney,
the court appointed Edward S. Day as special counsel to
assist the State's attorney in the prosecution, and this ac-
tion of the court is assigned as error. Assuming that Day
was employed by private parties to assist in the prosecution,
as contended by plaintiff in error, this fact, alone, is not
sufficient to warrant us in holding that the court erred in
appointing him as special counsel to assist the State's at-
torney. The trial court is vested with a discretion in such
matters, and a judgment of conviction will not be reversed
on this ground unless it appears that the trial court has
abused its discretion to the manifest prejudice of the de-
fendant. (*Hayner* v. *People,* 213 Ill. 142; *People* v. *Blev-
ins,* 251 id. 381; *People* v. *Donaldson,* 255 id. 19.) No
such abuse of discretion or prejudice is here shown, but,

on the contrary, the fact that each of the three defendants placed upon trial under the indictment in this case was represented by separate counsel, all of whom were able, experienced attorneys, justified the court in granting the motion of the State's attorney for the appointment of special counsel to assist· him in the prosecution.

It is urged that the verdict is not supported by the evidence. The principal witness for the People was William T. Kirby, from whom plaintiff in error was charged with obtaining $20,000 by means of the confidence game. During the period covering the transactions hereinafter detailed, and for some time prior thereto, Kirby was conducting a private bank in the city of Chicago. He testified that during the month of July, 1912, a stranger, whom he afterwards knew as Charles Kissell, entered the bank and inquired about a building which was being erected across the street ·from the bank; that subsequently he met Kissell on the streets of Chicago and on one occasion at Manhattan Beach, where he had a conversation with him in the presence of his (Kirby's) wife and children; that during the forenoon of October 28, 1912, Kissell came to the bank and represented to him that he had a brother-in-law who was connected with a large corporation, and that he desired Kirby to accompany him to the Western Union building to meet this brother-in-law and confer with him upon an important business proposition; that he accompanied Kissell to the Western Union building, and from there to the telegraph office in the Board of Trade building and met plaintiff in error, whom Kissell introduced as Mr. Shea, in the hallway just outside the telegraph office in the Board of Trade building; that plaintiff in error requested them to go to the Grand Pacific Hotel and wait for him there, which they did; that within ten minutes plaintiff in error came to the hotel, and, after obtaining Kirby's promise of secrecy, told him that he was a confidential man in the employ of the Western Union Telegraph Company; that he had been

working in Pittsburg but had been transferred to Chicago
for ten days; that the telegraph company had devised a
cipher code for transmitting and receiving results of horse
races from the various race-tracks of the country, and that
his duty while in Chicago would be to receive such messages,
decipher them and transmit them to the various pool rooms
in the city of Chicago; that it was within his power to
withhold a message for a reasonable length of time after
receiving it, and that if Kirby would station himself at
some place convenient to a pool room he would telephone
him the results of horse races before sending them to that
pool room, and Kirby would thereby be enabled to bet on
the horse that had won the race.  Kirby further testified
that plaintiff in error furnished him with a list of about
six places which he represented were pool rooms in the city,
and suggested that the witness and Kissell obtain entree to
one of those places and arrange to station themselves at
some place convenient thereto where he could communicate
with them by telephone; that it was also arranged that after
the witness and Kissell had obtained entree to some pool
room and had located a place convenient thereto where they
could be reached by telephone, the witness would notify his
bank where he could be called and would direct his cousin,
Daniel Kirby, the cashier of the bank, that when someone
called up, saying, "This is John; where can I reach Dr.
Kirby?" Daniel Kirby should inform him where he could
reach the witness by telephone; that after making these
arrangements the witness and Kissell started out to obtain
entree to one of the pool rooms on the list furnished by
plaintiff in error; that they were refused admission at the
first place and then went to the second place on the list,
where they were met by a man at the foot of the stairs
who informed them that there was "nothing doing" there
that day but directed them to go to 1710 Michigan avenue
and informed them that they would be admitted there; that
this man wrote upon a sheet of paper the words "Pass

two," signed certain initials thereto and delivered the same to Kissell; that the witness and Kissell then stationed themselves at a drug store on Eighteenth street, near Wabash avenue, and that the witness from there called up his bank and directed Daniel Kirby that if anyone by the name of John called up and wanted to know where the witness could be reached, to give him the telephone number of the drug store at which the witness was stationed; that shortly afterwards plaintiff in error called him over the telephone at the drug store and told him that he would call him again as soon as the result of a race was received; that the witness and Kissell remained at the drug store for something over an hour, when plaintiff in error again called him over the telephone and gave him the name of the horse that had won and told him to go over to the pool room as quickly as possible; that the witness and Kissell then went over to the room at 1710 Michigan avenue, where they were admitted by the same man who had directed them to that place; that the witness afterwards learned that the name of this man was O'Brien; that 1710 Michigan avenue was an old-fashioned three-story house; that he and Kissell went into the parlor of the house; that they first observed a man seated behind a table, who advised them to hurry, as it was nearly time to close the race; that when they were at the drug store Kissell asked the witness how much money he had with him, and that he replied that he had not brought very much money; that Kissell remarked that as it was only the first day they could make a small bet then and try it again the following day with a large bet; that he gave Kissell five dollars before they entered the alleged pool room and that Kissell added five dollars of his own money thereto; that Kissell wrote the name of the horse that had been given to the witness by plaintiff in error upon a slip of paper and gave it to the man seated behind the table, who looked at the ticket and said: "Well, gentlemen, I am awfully sorry, boys, but you know this is a

small bet—ten dollars. This is a kind of piker bet. I
don't want to offend you boys. We will take it in the
spirit that you offer it, but this place is for big play. We
have got to have large bets here. This is no place for the
man in the street to come in. This is for gentlemen of
means who like to place big bets;" that the witness replied
that he was sorry they did not know the rules, and in-
quired what the limit was; that the man behind the table
replied that the bets taken ranged from $10,000 to $50,000,
and the witness responded that they would try to accom-
modate him to the limit the following day; that on the
right side of the room was a portable blackboard, standing
beside which was the man who had directed them to this
place; that this man was in his shirt sleeves, with a piece of
chalk in his hand; that while the witness was in the room
a man approached the table and inquired how he stood; that
the man at the table looked at a book and replied, "After
that last race, Judge Mahoney, you owe the house $4000."
Kirby very positively identified the defendant Snarley as
the person addressed as "Judge Mahoney," and testified that
he did not have a beard at that time. He further testi-
fied that Snarley replied that he would mail a check for the
amount due from him and directed the man at the table to
telephone for his automobile; that immediately afterwards
a voice from an adjoining room in the rear called, "Close
the race," which was repeated by the man seated at the ta-
ble; that the result of the race was announced from the rear
room, showing the horse upon which Kirby and Kissell had
bet as the winner; that the witness heard the click of a tele-
graph instrument in the rear room while the man in that
room was calling the result of the race; that Kissell received
$20 from the man behind the table, who, when he paid the
money, said he would be glad to have them come back again.
Kirby further testified that he and Kissell then left this
place and went to the Blackstone Hotel, where they had
agreed to meet plaintiff in error; that they related to plain-

tiff in error what had occurred, and that he asked the witness how much money he could get to bet the following day, and the witness replied that he might be able to get $10,000; that plaintiff in error asked him if he could not get more than that, and that he replied that he might be able to get $20,000; that plaintiff in error then told him that as he was taking all the risk he would have to have sixty per cent of the winnings and that the witness and Kissell could have the remaining forty per cent to divide between them; that the witness then informed plaintiff in error that they would have to station themselves at some place other than the drug store, as the people there might become suspicious, and that plaintiff in error directed Kissell to find another place the following morning and requested Kirby to get the $20,000 in one-thousand-dollar bills; that thereupon it was agreed that the parties should meet at the Blackstone Hotel the following day at noon.

Kirby testified that the following morning he directed Daniel Kirby to draw a check for $15,000 on the Stockmen's Trust and Savings Bank and to go over to that bank and get $10,000 of the money in one-thousand-dollar bills; that Daniel Kirby went over to that bank as directed and returned with the $15,000, but that he only brought with him two one-thousand-dollar bills; that the balance was in bills of smaller denomination; that the witness took $10,000 of this money, including the two one-thousand-dollar bills, placed the money in a grip, ordered an automobile from the Emery Motor Company and went to the Blackstone Hotel, taking the grip with him; that he had previously arranged with the Slavic-American Bank to send over to his bank an additional $10,000, but that this money had not reached the bank when he left; that he telephoned his wife and requested her to call at his bank and bring this $10,000 to him at the Blackstone Hotel, and also directed Daniel Kirby to deliver the $10,000 to his wife when she called for it; that Edward Townsend was the name of the chauffeur sent by the Emery

Motor Company to take him from the bank to the Black-
stone Hotel on this occasion; that he reached the Blackstone
Hotel shortly before noon, but as neither of the other parties
had arrived he ordered Townsend to take him to the sub-
treasury building; that the purpose of this trip was to get
the money he had in the grip changed into bills of one thou-
sand dollars denomination; that he was unable to effect the
change at the sub-treasury and returned to the Blackstone
Hotel in the automobile; that on the way back to the hotel
he opened the grip, took out one of the one-thousand-dollar
bills and showed it to Townsend, remarking to him that that
was something he did not see very often and that he had a
quarter of a million dollars in the grip. He further testified
that upon his return to the hotel he met plaintiff in error
and Kissell in the room agreed upon, informed them as to
the amount of money he had brought with him and the ar-
rangements he had made whereby his wife was to bring
him $10,000 additional; that Kissell said he had located a
cigar store in the neighborhood of the alleged pool room
where they could station themselves; that shortly after-
wards his wife and his three children arrived at the Black-
stone Hotel in an automobile, and that he and Kissell got
in the automobile with his wife and he directed the driver
to take them to the corner of Eighteenth street and Wabash
avenue; that he asked his wife whether she had the $10,000
and that she replied that she had, and gave him an envelope
containing ten one-thousand-dollar bills; that he removed
these bills from the envelope and placed them in the grip;
that when they reached the corner of Eighteenth street and
Wabash avenue he and Kissell alighted and he directed the
chauffeur to take his wife and children home; that Kissell
then conducted him to a room in the rear of a cigar store
and told him that he had selected that as the place where
they would wait for the communication from plaintiff in er-
ror; that they went into a toilet room and he removed the
money from the grip; that he placed the twelve one-thou-

sand-dollar bills and $5000 in bills of smaller denomination
in his pocket and gave the balance of the money to Kissell;
that the cigar store was conducted by the defendant Kin-
nally; that the witness protested against remaining there
because there were four men seated at a table in the rear
room playing cards and he did not want to take any chance
of being robbed; that Kissell insisted upon remaining there,
but finally accompanied the witness from the cigar store to
a drug store at the corner of Eighteenth street and Indiana
avenue, from which place the witness called up his bank,
the telephone number of which was "Yards 186," and gave
Daniel Kirby the telephone number of the drug store, which
was "Calumet 1818;" that the witness then remarked to
Kissell that he would tell the clerk that he was Dr. Kirby
and was expecting a telephone message, which he did; that
shortly afterwards the witness was called to the telephone
by plaintiff in error, who directed him to remain there and
he would call him when the result of a race was known;
that the witness and Kissell then seated themselves in the
front of the store and remained there for about an hour
and a half, when the witness was again called to the tele-
phone and plaintiff in error informed him that the winner
of the race was "Lucky George;" that the witness and Kis-
sell then went over to the supposed pool room at 1710 Mich-
igan avenue and were admitted by O'Brien; that they went
into the parlor and up to the table and bet $20,000 on
Lucky George; that the man called Judge Mahoney was
present on this occasion; that shortly afterwards the bets
were closed, the telegraph instrument in the adjoining rear
room began to click, and a voice in that room described the
race in detail; that the winner of the race was announced,
but it was not Lucky George; that Lucky George came
in second; that he and Kissell left the room and went to
St. Hubert's Inn, where they had agreed to meet plaintiff in
error; that while there plaintiff in error called the witness
over the telephone and asked him if he had won; that he

replied that he did not win—that he lost; that plaintiff in error directed him to wait there and arrived at St. Hubert's Inn a few moments later; that plaintiff in error insisted that he had told the witness to bet on Lucky George for place,—that Kirby had misunderstood him,—but said they would get the money back the next day; that the witness informed him that he was "broke" and could get no more money; that after the witness and Kissell had eaten supper they went out to the bank in a taxicab and from there the witness went to his home, where he remained that night; that on the following day he met plaintiff in error, who assured him that the $20,000 would be returned to him; that a friend in Milwaukee had promised to send him $100,000, out of which he would re-pay the $20,000 and that they would use the remaining $80,000 to bet on races, but that plaintiff in error shortly afterwards disappeared without re-paying him the $20,000, and he did not thereafter see him until a short time before the trial of this case.

Mrs. Kirby corroborated her husband's testimony to the effect that on October 29, shortly before noon, she received $10,000 in one-thousand-dollar bills from Daniel Kirby at the bank, and, acting under the directions of her husband, she took this money to him at the Blackstone Hotel, where Kirby and a man whom she had previously met at Manhattan Beach with her husband entered the automobile in which she and her children were riding and were taken to the corner of Eighteenth street and Wabash avenue, where the two men alighted. She further testified that when she handed this money to her husband he opened a grip and she noticed there was other money in the grip.

Mrs. Pearl DeCoverly, a witness called by the People, testified that from August 30, 1912, until some time in January, 1913, she conducted a rooming house at 1710 Michigan avenue; that in October, 1912, she rented to a man named Kane two large front rooms on the main floor of the house, Kane representing that a friend of his who was

working on a patent wanted a couple of rooms for a few days, to use two or three hours each afternoon, and he thought they would suit him; that Kane told her that while they were using the rooms they would answer the doorbell; that Kane and his associates used the rooms at intervals for about two weeks, and that she saw plaintiff in error there one Sunday afternoon; that they gave up the rooms on October 29; that on such afternoons as Kane informed her they desired to use the rooms he requested her to remove the pictures and ornaments from the walls, and that the furniture was then moved around so as to bring a large library table near the door.

Edith Pope and Clara Monroe, who were rooming with Mrs. DeCoverly at 1710 Michigan avenue during the month of October, 1912, testified that during that period they met Kane there; that he used the parlors on the main floor, and that on one occasion while they were in those rooms Kane introduced them to a man by the name of Shea, and that plaintiff in error looked like that man.

Louis Borman, who worked for Mrs. DeCoverly during the same period, testified that during the latter part of October he on several occasions assisted in taking the pictures and ornaments from the walls in the front rooms of the house. He also testified that on one occasion at Kane's request he took a telegraph instrument to a repair shop, and after it was repaired returned it to Kane at 1710 Michigan avenue. Other witnesses who saw Borman at the repair shop with the telegraph instrument testified that it was not the ordinary instrument used by telegraph operators but was of low voltage, and had an attachment which could be put on the floor or under a table or carpet and operated with the foot, and that by means of this foot attachment messages could be transmitted to the instrument. In other words, that while messages were apparently received from an outside source by this instrument they were in fact transmitted to the instrument, by means of the foot attachment,

by the same person who was receiving the pretended messages.

James A. Patterson, who conducted a drug store at the corner of Eighteenth street and Wabash avenue, corroborated Kirby in his testimony that he and Kissell telephoned from that drug store during the latter part of October, 1912, and that on that occasion they were in the drug store for more than an hour waiting for a return call.

Edward Townsend corroborated Kirby's testimony to the effect that during the latter part of October, 1912, while Townsend was in the employ of Emery & Co. as a chauffeur, he conveyed Kirby in an automobile from his bank to the Blackstone Hotel and from there to the sub-treasury, and that on the return trip from the sub-treasury to the Blackstone Hotel Kirby took a thousand-dollar bill from a grip, showed it to him and remarked that he had nearly a quarter of a million dollars in the grip.

Daniel Kirby corroborated Kirby's testimony with reference to telephone calls at the bank and with reference to obtaining $15,000 from the Stockmen's Trust and Savings Bank on October 29, of which amount Kirby took $10,000 and placed in a grip. He also testified that on October 29 John Shea called up the bank by telephone and inquired where Kirby could be reached, and that he told him to call "Calumet 1818," Kirby having previously informed him that he could be reached at that number.

Alice E. Seegmuller testified that she was a telephone operator at the Drexel Arms Hotel during the month of October, 1912, and that she kept a record of all telephone calls sent out from the hotel; that during that period plaintiff in error, under the name of John Shea, was rooming at the hotel, and that he occupied room No. 523; that there was a telephone in that room; that on October 29 Shea asked for a connection with "Yards 186," and when he got the connection asked if that was the Kirby Bank, and that she did not listen to any more of the conversation.

Major Auld, a witness for the People, testified that dur-
ing the month of October, 1912, he was employed as bell-
boy at the Drexel Arms Hotel, and that during that period
plaintiff in error was a guest at that hotel, occupying room
No. 523; that on October 31 he was sent to that room to
answer a call, and upon entering the room saw plaintiff
in error and two other men in the room; that they had a
large sum of money in bills, tied up in packages and heaped
on the table, and that plaintiff in error also had some money
in his hands.

The hotel register of the Drexel Arms Hotel was of-
fered in evidence, and it shows that John Shea registered
at the hotel on September 9, 1912, and was assigned to
room No. 523 and remained there until the first of Novem-
ber. The clerk of the hotel testified he was acquainted with
the person who registered under the name of John Shea at
this hotel, and that plaintiff in error was that person.

Ewen Pinkhard, called as a witness by the People, was,
over the objection of plaintiff in error, permitted to testify
that during the month of March, 1912, while riding on a
train in the State of Alabama, he met a man who gave his
name as Charles Howard; that Howard induced him to
accompany him to Nashville, Tennessee, where he intro-
duced him to plaintiff in error, who was then going under
the name of Daggert, and represented that plaintiff in error
was his uncle; that plaintiff in error was in the office of
the Western Union Telegraph Company at Nashville when
he met him and made an appointment to meet the witness
at a hotel in Nashville shortly afterwards; that as a result
of the conversation which he had with plaintiff in error at
the hotel he accompanied him to Chicago upon the repre-
sentation that he was in the employ of the Western Union
Telegraph Company as a special operator and had been
transferred to Chicago; that he received the results of horse
races and transmitted them to the various pool rooms, and
that he would furnish the witness with the results of horse

races before they had been furnished to the pool rooms, provided he would bet on the horses and divide the winnings with plaintiff in error. The story then detailed by this witness discloses the same scheme by which Kirby claims he was defrauded out of $20,000, and as a result of this scheme Pinkhard claims he lost $5000.

The record discloses other evidence strongly corroborating Kirby's testimony, but we deem it unnecessary to make any specific reference to the same.

Neither plaintiff in error nor any of the persons charged to have been connected with him in the alleged scheme testified in this case. The defense consisted of an attempt to show that the defendant Snarley, whom Kirby testified he saw in the room at 1710 Michigan avenue on both occasions when he was there and whom he says he heard addressed as Judge Mahoney, at that time had a beard and was in Springfield on October 29, and certain documentary evidence showing that November 2, 1912, a petition in bankruptcy against Kirby was filed in the United States District Court for the Northern District of Illinois; that in the bankruptcy proceedings both Kirby and his wife were adjudged guilty of contempt of court for failure to turn over assets of the bankrupt's estate to the trustee in compliance with an order of court and were committed to the county jail, and were on April 29, 1913, indicted for concealing assets from the trustee in bankruptcy. No attempt was made to directly contradict any of the testimony given by the witnesses for the People, except the testimony of Kirby that he saw the defendant Snarley in the room at 1710 Michigan avenue on October 28 and 29.

The contention that the verdict is not sustained by the evidence is based upon the assumption that there is no proof that any of the representations made by plaintiff in error to Kirby which induced him to bet $20,000 on "Lucky George" were false, and that consequently the *corpus delicti* of the crime with which plaintiff in error was charged was

264 — 29

not proven. It may be conceded that there is no direct evidence showing the falsity of the statements and representations made by plaintiff in error to Kirby to induce him to bet on Lucky George at the alleged pool room, and that it was necessary to prove the falsity of such statements or representations in order to establish the *corpus delicti* of the crime, still it was not necessary to prove such matters by direct evidence. The *corpus delicti* may be proven by circumstantial evidence. (*People* v. *See,* 258 Ill. 152; *People* v. *Hotz,* 261 id. 239.) The circumstances disclosed by the evidence in this case fully warranted the jury in believing that the various statements and representations made by plaintiff in error to Kirby concerning his connection with the Western Union Telegraph Company and his ability to learn the results of horse races before such information was communicated to pool rooms were false. In our judgment the evidence conclusively shows that Kirby was the victim of a fraudulent scheme, in the execution of which plaintiff in error took an active, prominent part; that as a part of this scheme the rooms at 1710 Michigan avenue were arranged by plaintiff in error and his associates to represent a pool room where bets could be made upon the results of horse races, but that the apparent bet there made with Kirby was, in fact, a swindling operation, in which advantage was taken of the confidence reposed by Kirby in plaintiff in error. No attempt was made by plaintiff in error to explain any of the circumstances which, in the absence of explanation, inevitably lead to the conclusion that plaintiff in error is guilty of the crime of which he was convicted.

It is urged that the court erred in permitting the witness Ewen Pinkhard to testify to an offense committed by plaintiff in error other and distinct from the offense charged in the indictment. The testimony of Pinkhard, the substance of which has been set out above, shows that plaintiff in error had previously used the same confidence scheme to obtain money from Pinkhard that he used to obtain the money

from Kirby. Such evidence was competent for the purpose of showing guilty knowledge. *Juretich* v. *People,* 223 Ill. 484; *People* v. *Weil,* 243 id. 208; *People* v. *Donaldson,* 255 id. 19.

Plaintiff in error also complains that the court, over his objection, permitted four witnesses whose names were not indorsed on the indictment to testify on behalf of the People. In *People* v. *Weil, supra,* we said: "And it is within the sound legal discretion of the court to allow a witness to be called whose name is not indorsed on the back of the indictment, (*Logg* v. *People,* 92 Ill. 598,) and the exercise of that discretion will not be reviewed by this court unless it appears that the defendant has been taken by surprise, (*Gifford* v. *People,* 148 Ill. 173,) and the burden is upon the defendant to show that he was surprised." It appears from a colloquy between the State's attorney and the attorney for plaintiff in error that the former had, two days before the trial, furnished the latter with a list of witnesses to be called by the People upon the trial of this case and that the names of these witnesses were upon that list. No attempt was made by plaintiff in error to show that he was surprised by the action of the State's attorney in calling these witnesses, the only objection interposed being that the names of these witnesses were not indorsed upon the indictment. Under such circumstances there was no abuse of discretion on the part of the court in permitting these witnesses to testify.

The court admitted in evidence, over the objection of plaintiff in error, an order of the United States District Court for the Northern District of Illinois made June 4, 1913, finding Patrick O'Donnell, James Rosenthal and Francis Houlihan not guilty of obstructing justice. None of these parties were witnesses in this case, but it had developed during the trial that they were attorneys and represented Kirby and his wife in various proceedings taken against them in the bankruptcy matter on the charge of

concealing assets from the trustee of the bankrupt's estate. Proof that in the bankruptcy proceedings they had been found not guilty of obstructing justice was wholly irrelevant in this case and could have been of no assistance to the jury in arriving at a verdict. While the admission of this order in evidence was error it was harmless error, as it could not have influenced the jury in returning a verdict of guilty against plaintiff in error.

As hereinbefore stated, Kirby positively identified the defendant Snarley as one of the persons present in the rooms at 1710 Michigan avenue on October 28 and 29, and testified that Snarley at that time did not have a beard. Plaintiff in error offered to prove by several witnesses that Snarley during the latter part of October had a beard, and further, that on October 29 he was in Springfield. The court refused to permit this proof to be made, and in this particular erred. The evidence offered was competent for the purpose of discrediting the testimony of Kirby, if the jury should have seen fit to give to it that effect. The admission of this testimony, however, could not have affected the verdict. The story detailed by Kirby was in so many particulars confirmed by the testimony of various other witnesses, that in the absence of any evidence offered by plaintiff in error to deny or explain the material parts of Kirby's testimony connecting plaintiff in error with the crime the jury must necessarily have found him guilty, notwithstanding they may have disbelieved Kirby's testimony regarding the presence of Snarley at the alleged pool room on the occasion when Kirby was there.

There are no such errors in the record as require a reversal of the judgment. The judgment of the criminal court is affirmed.

*Judgment affirmed.*