The People of the State of Illinois, Defendant in Error, v. William Carmen et al., Plaintiffs in Error.

Gen. No. 39,184.

Heard in the second division of this court for the first district at the October term, 1936. Opinion filed March 30, 1937. Rehearing denied and additional opinion filed April 16, 1937.

HAROLD L. LEVY and WM. SCOTT STEWART, of Chicago, for certain plaintiffs in error.

N. ROTHBLUM, of Chicago, for certain other plaintiff in error.

THOMAS J. COURTNEY, State's Attorney, for defendant in error; EDWARD E. WILSON, C. VERNON THOMPSON and WILLIAM J. LYNCH, JR., Assistant State's Attorneys, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

William Carmen, J. E. Stinson and Henry T. Sather were tried in the criminal court under an indictment consisting of 12 counts, charging conspiracy. The jury returned verdicts finding all defendants guilty. They were sentenced, under the statute, to the penitentiary for terms of not less than one year or more than five. The prosecution of this writ of error followed.

There were counts in the indictment charging that the defendants unlawfully, wilfully, fraudulently and deceitfully conspired, combined and confederated with each other, and with divers persons unknown to the grand jury unlawfully, wrongfully, wickedly, knowingly and designedly to cheat and defraud holders of obligations, securities, stock certificates and indentures of any kind or nature whatever, issued by the Great Eastern Natural Gas Company; separate counts

charging that defendants conspired to so cheat and defraud one Ross J. Beatty, one Margory Cowan and one Frank J. Buckridge; counts charging conspiracy to obtain the personal property of the holders of obligations of the Great Eastern Natural Gas Company by false pretenses and also to obtain the property of Cowan, Beatty and Buckridge by false pretenses.

The case was presented to the jury under three separate transactions. It was first shown that Margory Cowan conducted a dress shop at 58 E. Washington street, Chicago. In December, 1935, defendant Stinson called at her place of business to purchase 500 shares of the Great Eastern Natural Gas Stock which she owned. Stinson told her that some of the Great Eastern stock had been sold to the Trinidad International Petroleum Company, which had purchased some land from the Great Eastern, and that there were some very valuable notes connected with the Great Eastern that were then selling on the London market, and that he wanted to acquire some stock so that he could sell it on the English market, where it was bringing around $5 a share. Stinson told Miss Cowan that the Trinidad International was successfully operating properties in the West Indies. It appears from the evidence that Miss Cowan then said to Stinson, "If you can make money on this stock, why couldn't I?" and he replied, "Yes, you can if you have the money or if you can get the money." Miss Cowan told him that she had had financial reverses and would have to borrow money from her sister's bank account; that there had been sickness in her family, business was not very good, and that she had lost substantially everything she had and could not afford to lose "one dollar or even a penny." Stinson then told her "I have already checked this, and it is absolutely O. K. Do you think I would be out buying the stock if it wasn't?"; that he wanted to buy the stock because there was an opportunity to make some money. He thereupon gave her

his card, and in leaving said "in your case I might raise this a little," and offered her 50 cents a share, which would aggregate $250 for her stock.

About three days later William Carmen, who had various aliases, telephoned Miss Cowan and told her his name was Cameron; that he had just returned from New York and should have seen her on his way to New York, but that he was very busy with other stockholders and was now returning to Los Angeles; that he desired to acquire her stock and exchange it for Trinidad International Petroleum, because Mr. Danzinger, his superior, had sent him out to purchase stock. Following this conversation Cameron went over to see Miss Cowan at her place of business. He said it was his mission to see her about the exchange of the Great Eastern stock and the Trinidad Petroleum notes. Miss Cowan told Cameron (or Carmen) that she was not inclined to do anything about it because of her many responsibilities and sickness in the family. Cameron replied that if she would let him explain the transaction he could probably get her to see it in a different light. He represented the Trinidad International Petroleum Company as a very successful concern, took out a book and showed her the location of a great many oil wells that were operating successfully in the West Indies. Miss Cowan then asked him why, if the company was so successful, it did not retire the notes in question, and Cameron replied, "My goodness, that cannot be done until they have been sold out," and that the Trinidad notes were 20 per cent profit bearing notes and would be closed out in February; that the company owned valuable property in Ethiopia, and if it wasn't for the war it would be operating there. The proposed transaction was explained to Miss Cowan as follows: She was to give her 500 shares of stock and $1,500 in cash, and in return was to receive $2,500 and 500 shares of the Trinidad International Petroleum. This she could keep or sell, as

she chose. Cameron told her that the Trinidad stock was listed on the London and New York stock exchanges, and assured her again that the company was operating extensively and producing oil in abundance from wells which it owned. Miss Cowan gave him her stock and the $1,500. Cameron said that he had been in the oil fields during the greater part of his life and knew about oil wells; that the Great Eastern was a good company, and its president was one of the cleverest men in the country and a great geologist. Miss Cowan called Cameron's attention to the fact that Stinson had called on her, and showed him Stinson's writing. He looked at it and said "that is strange, so many people who own Great Eastern stock have told me the same thing. They had had other people call them from New York and other places"; and that "we didn't want this thing to be known. We wanted to keep it quiet"; that Mr. Danzinger had sent him out to clean up the situation and be through with it. He read Stinson's paper over and remarked that, although he did not know Stinson and had never met him, Stinson had the situation right. After she had signed checks and turned over the stock to Cameron she called Stinson and asked him about the stock; he said "I spent all my money on 1,000 shares that I bought for myself." Miss Cowan asked him if he was going to sell the stock, and Stinson said "No, I'm going to wait for it to be retired." She then inquired whether he had ever met a man named Cameron, and he said that he had not. She told him that a man named Cameron had come in to see her, and asked Stinson whether he would recommend her going along with the transaction, and Stinson replied, "Yes, there is no uncertainty about it." Miss Cowan later had another conversation with Stinson, in which she told him that some of her friends were criticizing her for entering into the transaction. Stinson assured her that she need not be concerned, that people had also criticized

him for buying the stock, and that he was not selling his stock but was waiting for it to be retired in February. Cameron again called on Miss Cowan about January 8, 1936, to tell her when the Trinidad notes would be paid, and spoke of a man having died leaving 5,000 shares of Great Eastern stock which he could probably. acquire for $1 a share inasmuch as the estate wanted the matter settled quickly, and he showed Miss Cowan a pocketbook supposed to contain $2,500, told her that he would like to sell part of this new stock as money seemed plentiful, but was hard to get, and that he thought he had a man who would take this stock off his hands.

It was shown on cross-examination that Miss Cowan was 58 years of age and had been in business some 15 or 18 years. The card given Miss Cowan by Stinson read "Consolidated Realty Company." When Cameron was arrested he had $2,000 in his pocket. Miss Cowan subsequently brought suit and they paid her $1,500 upon dismissal of the proceeding. Other relevant facts disclosed by the evidence showed that Cameron had represented the principal offices of the company as being in the Continental Building at Los Angeles, Calif., and that Danzinger, mentioned as Cameron's superior, had been connected with large oil companies throughout the world for a period of 20 years.

The second transaction was had with Frank J. Buckridge, who owned 500 shares of Great Eastern stock. A man giving his name as Anderson called on Buckridge and said he wanted to buy this stock because there was a company on the west coast that would allow $2 for every share of Great Eastern stock, and he and his partner were going to buy up these shares. He explained to Buckridge that this company on the west coast would allow $2 a share to apply on the Trinidad International Petroleum stock, which was selling on the English exchange at $5 a share, and

that there was a note that would mature in a couple of months and they would realize a profit on that note and were going to take the Great Eastern stock and put it up as collateral. Anderson called on Buckridge only once, but later contacted him over the telephone on several occasions. He told Buckridge that if he desired to sell his stock, he would have to have a certificate of right from the Wake Development Company. Early in January, 1936, Buckridge went to the hospital. Some one telephoned him there and said he desired to see him. Buckridge said he wasn't in condition to talk at that time and the party calling told Buckridge that he was leaving for Los Angeles that night and it was important that he should see him before leaving. Buckridge suggested taking a cab and coming over, but the party calling did not arrive that night. January 8, Cameron called at the hospital and told Buckridge that he represented the Wake Development Company, Los Angeles, Calif., and wanted to talk about the Trinidad International Petroleum stock. Buckridge then called Anderson and said "look here, you are trying to buy this stock; now here is a fellow telling me not to sell it, but to buy Trinidad International," to which Anderson replied, "there must be some mistake, because I have a partner by the name of Conklin." While at the hospital Cameron tried to explain the transaction to Buckridge and showed him letterheads containing the names of various officers represented as being engaged in some "big oil deals." Buckridge told Cameron that he never did anything on impulse, especially if he was suspicious; that he had requested a friend of his in Philadelphia to check on the matter and make inquiries at Wilmington and see what information could be obtained about the Great Eastern Natural Gas Company, or find out something about the Wake Development Company; that he had been advised that these concerns did not not even have an office in Wilmington, but only a telephone in a room

with many other telephones. Buckridge also told Cameron that he had checked on the New York office and couldn't secure any information from the vice president or the executives of the Great Eastern Natural Gas Company; that he had written to Los Angeles and had been advised that if he could get 50 cents a share for the Great Eastern stock he had better take it, because "this thing looks fishy," inasmuch as inquiry disclosed that the Wake Development Company and the Trinidad International Petroleum Company were all in the same office and their affairs were in charge of the same people. Finally Buckridge told Cameron that before putting any money into the matter he wished to think it over further, and Cameron said "I am going to Cincinnati tonight." Buckridge then called his attention to the fact that he had said he was going to Los Angeles, and Cameron said "My plans are changed, I am going to Cincinnati and from there to Dayton and then to Detroit; when you decide to buy this stuff or make this exchange and get your rights, write the Wake Development Company and send a check at that time for $1,500." Cameron then asked Buckridge if he had $1,500, and upon Buckridge's assurance that he did, Cameron explained that there would be an allowance of $2 a share for every share of Great Eastern owned, and there was $3 a share for every share of Trinidad International; that for every share there was a pound note that would mature in February, or at the very latest in March, and that Buckridge would realize a five pound note for every share. He told Buckridge the stock was listed on the English exchange, and was being quoted at a pound, which was equivalent to $5 in American money; and that there were oil lands in Mexico. When asked why Trinidad International was so generous in allowing $2 for the Great Eastern, Cameron explained that one of the stockholders held an option and owned

the property in Mexico, which in turn owned all the surrounding property, and it was taking in this stockholder because he had more than 200,000 shares of the Great Eastern Natural Gas stock. Buckridge asked Cameron if he knew Anderson, and Cameron said that he did not and in fact he did not know anybody in Chicago, and he said to Buckridge "don't have anything to do with them, they couldn't do anything with the stock anyway unless they had the rights." At the trial Buckridge pointed out defendant Henry T. Sather as being the man who called on him and gave his name as Anderson.

The third transaction was had with Ross J. Beatty, who on January 4, 1936, received a telephone call from a man by the name of Stinson, whom he had known before. Stinson called on Beatty and said "I know we owe you some money and haven't been able to pay it, but we have a matter I want to discuss with you." Beatty insisted that his son be present at the conversation. Accordingly, with his son, he went to see Stinson in Harris's office. It appears from the evidence that Harris was an alias for Sather, otherwise known as Anderson. When they reached the office nobody was there except Stinson, but later Harris came in. Stinson told Beatty that he had had "a sort of break across his path"; that he had bought some Great Eastern stock several days before and that he thought he was making a good investment but it had dwindled down so that it was practically of no value; but that he received a letter from the Wake Development Company of Los Angeles telling him that from the record it knew he was a holder of some stock in the Great Eastern Company; that it was underwriting it and had a plan whereby it had use for the stock and would have a representative call on Stinson and present the plan; that Cameron had come to see him and told him how to handle the Great Eastern

stock and exchange it for Trinidad International Petroleum; that a value of $2 a share had been placed on Great Eastern for purposes of the exchange, and in order to consummate the deal the offer had been raised to $3. Stinson told Beatty this sounded very good to him, inasmuch as the Trinidad Company did business all over the world and were international in character; that it had tremendous holdings of oil lands, and the fact that these notes of $5 value were going to be called in four instalments during the month of February would result in the return of practically all the money during that month, with the result that they would have the Trinidad Petroleum stock free to sell or hold, as they chose; that he, Cameron, had 5,000 shares, but did not have the money to invest, and wanted to explain the transaction to see what Beatty thought about it. Stinson told Beatty that Cameron, who presented the plan, was likely to come in any minute, and while they were talking the arrival of Cameron was announced. Stinson told Cameron that he had been telling Beatty about the deal, that he couldn't raise the money, that he might as well be frank and tell Cameron that he owed Beatty money, and that if he could get Beatty into the deal it would enable him to pay his obligation to Beatty. Cameron said he thought it could be arranged, and told Stinson "I haven't much time to spare, I have a great many stockholders of the Great Eastern Natural Gas Company to be called on to present this proposition to them, and they either accept it, sign the acceptance on this stock, or acknowledge on the back of it that it has been presented to them and they declined it." Cameron said that he represented the Wake Development Company of Los Angeles, the underwriters of this deal, and that it was more or less connected with the Doheny outfit on the Pacific coast, and also with Mr. Danzinger, a prominent oil operator in different parts of the

country. Cameron told of his travels, that he had spent much time in Paris and London, and about the holdings of the Trinidad Company in different parts of the world, and about Mussolini having oil lands that Danzinger had tied up for the benefit of this company; that Mussolini and Danzinger were close friends and had entered into a deal covering an enormous field in Ethiopia, which it couldn't operate because of the existing war between Italy and Ethiopia; he said "after while we will get around it," and that there was no doubt but that it would increase the value of the Trinidad International Petroleum stock at least one hundred million, and that if they would hold their stock they would make a great profit. He also explained that the reason that the stock wasn't listed in this country was that it was financed in London, but that it was listed on the board of trade in London. After Harris, Stinson's associate, had listened to practically all the conversation, he arose and passed Beatty's chair, saying "I guess there is no need of my staying here any longer, I will go out and see if I can earn an honest dollar." Before Cameron came in Stinson had told Beatty that the stock was listed in London, and said "I went out and bought a New York paper, in order to check it up. Excuse me, I will go into one of the other offices and I will get the paper," and he procured it and showed Beatty the name "Trinidad" listed there at so many pence and shillings, and said that this was their stock; also that the Great Eastern Company had big holdings in Mexico and New Mexico, and large holdings in the vicinity of the Trinidad Petroleum lands; all of which made it necessary that it get control of these properties.

Stinson had sought to interest Beatty to the extent of . $15,000, and after these various conversations Beatty told him that he would see if he could raise the money. Stinson called again the following day. Cam-

eron was expected, but before he came Stinson told Beatty he wanted to talk about how they would divide the contemplated profit of $50,000. A receipt had been signed by J. E. Stinson and one by W. C. Cameron for the Wake Development Company. A letter had been written to the Wake Development Company signed by Stinson, and a power of attorney by Stinson to Beatty. All these documents were received in evidence. While Stinson was seeking to consummate this deal the police officers came in and arrested him.

William S. O'Neill, a police officer assigned to the blue sky department of the State's attorney's office, went to a room at No. 1 LaSalle street, which Beatty occupied. After waiting there a while Stinson came in, followed by Carmen, or Carter, as he was also known. Carmen told Beatty that he wanted to see what he could do for his friend Stinson; that he was an agent for the Trinidad Company, working for the Wake Development Company; that he had just met Stinson a couple of days before, and had taken a liking to him; then again related the value of the respective shares of stock, spoke of Danzinger, the Ethiopian situation and oil properties in Mexico, and of the various valuable holdings of the company. Carmen then called a stenographer and dictated a power of attorney and told the Beattys to draw their check for $15,000 and send it with the power of attorney to the Wake Development Company in Los Angeles. He said the oil well was owned by the Trinidad International Company and that it was the greatest oil well in the world. After Carmen drew up the power of attorney and asked that check for $15,000 be drawn payable to the Wake Development Company he got up, put on his coat and said he was in a hurry to get away. The officer placed him and also Stinson under arrest. When they reached the State's attorney's office the officer asked Carter his name. Carter said that it was either

Carmen or Carter, and that he had no particular abode. Later on he told the officer that he lived at the Morrison hotel. He finally changed it to the Stevens hotel, and then said "I am at the Morrison but I didn't stay there last night." The officer then asked him what his real name was. He said "I use so many names I don't know what name I am registered under." The officer then told him that he was arrested on charges of selling Trinidad International Petroleum, and Carmen said "if you are going to lock me up I will tell you where I live," and asked to be taken to the Congress hotel. The officer took him there, and as he entered the lobby Carmen said "you don't know what name I am under here, let me get the key." He procured the key and went up to room M 52, inserted the key in the door and opened it and then pointed to his luggage, consisting of four or five bags. Almost immediately thereafter the telephone rang. Carmen answered and the officer said, "Tell whoever that is to come up," but he heard Carmen say: "Nope, he isn't here. I tell you he isn't here, but he is over at the State's attorney's office. I am up here with a couple of coppers, the joint is hot." The officer then asked Carmen who called and he said "Some guy," and shortly thereafter there was a knock at the door and Harris, or Anderson, smoking a cigar, entered and said: "I am just in time," and the officer told him to come in and sit down and close the door, and upon being asked his name Harris replied "Oh, I am in the wrong place, I will be going," to which the officer replied "wait a minute, what is your name and who is this man?" Harris replied "I don't know him. I never saw him in my life." Then Carmen spoke up and said: "Oh, tell them everything. They've got our play house knocked over. They know all about the racket." Carmen then said to Harris: "Did you want the hotel to fall down on your head, I told you the

place was hot and full of coppers, but you came in, so sit down and make yourself at home.'' Thereupon Harris, or Anderson, alias Sather, said: ''Gee, I figured you were throwing a little party and celebration and didn't want me in, that's why I came up.'' The next day Miss Cowan was brought into the room where Carmen, Anderson or Harris were seated, and Carmen looked at her and said: ''That was a lousy touch, I will kick that touch back to her. I never went in for shawl touches in my life.'' The officer testified that he inquired what ''shawl touches'' meant, and Carmen said that was ''taking money from an old woman.'' While still in the custody of the police, January 11, 1936, Carmen told the officers that his right name was ''Carter,'' but that he also used the names ''Calvert'' and ''Cameron''; that he was registered at the Congress hotel under the name of Calvert, and at the Morrison hotel under the name of Carmen. He also told the officers that Danzinger, the proprietor of the Wake Development Company, was in Europe at the time, and that Alda Falkner was a stenographer and clerk at the Wake Development Company in Los Angeles, and was a sister-in-law of Danzinger and one of the officers of the Trinidad International Petroleum Company. The officers asked Carter if the stock was listed on the London exchange and he said it was not, that in fact it was not listed on any exchange. Carter also told the officers that the pound notes referred to in the various conversations were not listed anywhere; that they were just a kind of a ''come on'' to give prospective purchasers the idea of an extra bonus; and that they did not have any oil wells anywhere in operation, but intended to develop some later.

On oral argument defendants' counsel confined himself to the single contention that the judgment ought to be reversed because the State failed to prove that the representations made were false, and he conceded

that if such proof had been adduced under any count of the indictment the conviction could be sustained.

The State relies principally upon two decisions. The first of these is *People v. Strosnider,* 264 Ill. 434. In that case an indictment was returned against Strosnider and several others. It consisted of two counts, the second of which was *nolle prossed,* and the trial proceeded on the first count charging defendants with obtaining money by means of the confidence game. William T. Kirby conducted a private bank in Chicago, and during the summer of 1912 became acquainted with a stranger whom he afterward knew as Charles Kissell. Kissell represented to Kirby that he had a brother-in-law connected with a large corporation who wished to discuss an important business proposition. By appointment Kirby and Kissell proceeded to the Grand Pacific hotel, where they met Strosnider, who, after obtaining Kirby's promise of secrecy, told him that he was a confidential man in the employ of the Western Union Telegraph Company and had been transferred to Chicago to decipher codes for transmitting and receiving the results of horse races from the various race tracks of the country, and a plan was outlined by which Kirby and Kissell were to station themselves in a drug store in the vicinity of a bookmaking establishment where bets could be placed, receive the results of the races from Strosnider by telephone and thereafter place bets on the winning horse on information telephoned by Strosnider. Through this means Kirby was induced to place a bet of $20,000 on "Lucky George," a horse that finished second. Immediately after the race Strosnider met Kirby and said he must have misunderstood the telephone message, inasmuch as his advice was to bet on the horse to place and not to win. Strosnider tried to induce Kirby to place another bet the following day and assured him that they would recover the money lost, but

Kirby said he had no more money, and Strosnider thereupon promised to obtain money from a friend in Milwaukee, return the $20,000 to Kirby and use the balance for placing some additional bets. Shortly thereafter Strosnider disappeared, and Kirby never again saw him or Kissell until after they were apprehended. In that case the contention was likewise made that the verdict was not sustained by the evidence, upon the assumption that there was no proof that any of the representations made to Kirby, which induced him to bet $20,000 on "Lucky George," were false and that consequently the *corpus delicti* of the crime, with which Strosnider was charged, was not proven. In discussing this contention, the court said (p. 450):

"It may be conceded that there is no direct evidence showing the falsity of the statements and representations made by plaintiff in error to Kirby to induce him to bet on Lucky George at the alleged pool room, and that it was necessary to prove the falsity of such statements or representations in order to establish the *corpus delicti* of the crime, still it was not necessary to prove such matters by direct evidence. The *corpus delicti* may be proven by circumstantial evidence. (*People v. See*, 258 Ill. 152; *People v. Hotz*, 261 id. 239.) The circumstances disclosed by the evidence in this case fully warranted the jury in believing that the various statements and representations made by plaintiff in error to Kirby concerning his connection with the Western Union Telegraph Company and his ability to learn the results of horse races before such information was communicated to pool rooms were false. In our judgment the evidence conclusively shows that Kirby was the victim of a fraudulent scheme, in the execution of which plaintiff in error took an active, prominent part; that as a part of this scheme the rooms at 1710 Michigan avenue were arranged by plaintiff in error and his associates to represent a pool

room where bets could be made upon the results of horse races, but that the apparent bet there made with Kirby was, in fact, a swindling operation, in which advantage was taken of the confidence reposed by Kirby in plaintiff in error. No attempt was made by plaintiff in error to explain any of the circumstances which, in the absence of explanation, inevitably lead to the conclusion that plaintiff in error is guilty of the crime of which he was convicted.'' This decision was followed by *People v. Harrington,* 310 Ill. 613, wherein one Rutkauskas, of Lithuanian descent, became acquainted with Harrington and one Lebecki. About a year after the parties met Lebecki told Ratkauskas that Harrington was a broker and did business in Wall street, New York, bought buildings, stocks and other things, and that he had some investments that would pay 50 per cent for every $100 invested within a period of six weeks. Rutkauskas invested $150 and his brother and one John Stapits each invested $100. This money was paid to Harrington, who assured them that it was a good investment, and that they ''will make lots of money.'' From time to time thereafter Rutkauskas and various others made investments with Harrington, which ultimately totaled $30,000, and Rutkauskas himself invested $1,200 of this amount. Defendants were charged with obtaining money by means of the confidence game, and it was there likewise contended that the State had not proved the falsity of the statements made by defendants to their victims. The court cited *People v. Strosnider, supra,* and said that the gist of the crime is the obtaining of the confidence of the victim by some false representation, and that the fact that the representations made were false may be proven by circumstantial evidence. In discussing the question under consideration the court said (p. 616):

''The returns which plaintiffs in error promised were many times larger than returns ordinarily ex-

pected from legitimate undertakings, and the natural inference to be drawn by any well-informed person would be that the proposition offered by plaintiffs in error was fraudulent. Plaintiffs in error represented to their customers that they had connections with Wall street and that they made these extraordinary returns by dealing in stocks and real estate. If these statements were true plaintiffs in error could have proven their truth. With nothing but the description of the scheme before them the jury were fully warranted in believing the statements were false.''

In respect to the extravagance of the representations made by the defendants in this proceeding, it may likewise be said that the returns promised ''were many times larger than those ordinarily expected from legitimate undertakings.'' Moreover, Carter admitted the statements were false and that was admissible against him; and there is evidence that the other defendants told Miss Cowan and Mr. Buckridge that they were trying to reach all those who owned Great Eastern stock. In the nature of things it would be impossible for the State to show the falsity of representations that these oil companies had properties in Ethiopia and the West Indies, that Danzinger was a close friend of Mussolini's, that operations of wells in Ethiopia were temporarily delayed because of the Italian-Ethiopian war, that these companies had valuable properties in Mexico and New Mexico, and that their securities were listed on the London exchange. None of the defendants took the stand to explain these extravagant representations or any of the circumstances testified to by the State's witnesses, and we think the jury were fully warranted, in the absence of any countervailing proof or explanation, in believing that the representations were false.

Various other points are urged as ground for reversal, but we find in them no convincing reasons for

reversal. Upon the evidence presented, the jury could not well have arrived at any other verdict. **Therefore** the judgment of the criminal court is affirmed.

*Affirmed.*

JOHN J. SULLIVAN, P. J., and SCANLAN, J., concur.

ADDITIONAL OPINION UPON PETITION FOR REHEARING.

Plaintiff in error, J. E. Stinson, filed a petition for rehearing in which his present counsel, who came into the proceeding since the opinion was filed for the sole purpose of presenting the petition for rehearing, asserts that we "necessarily must have overlooked the fact that instruction No. 9, given at the instance of the State, told the jury that in the event the jurors signed the verdict finding defendants guilty of conspiracy 'it then became the province of the court to determine the punishment to be given, which cannot be in this instance more than one year in the county jail or a fine not to exceed $2,000, or both.' "

The original briefs were prepared and filed by able counsel who represented all the defendants, including Stinson, and no criticism whatsoever was made as to any instruction. The first mention of the foregoing instruction is contained in Stinson's petition for rehearing.

Rule 13 of the Appellate Court provides the time within which petition for rehearing shall be filed, and that "such petition shall state concisely the points supposed to have been *overlooked or misapprehended* by the court, with proper reference to the particular portion of the original abstract *and brief* relied upon." (Italics ours.)

The rule is well established that a petition for rehearing may not raise new points. (*Scott v. Scott,* 307 Ill. 586.) The right to rehearing is not statutory, but is based upon the desire of the court to correct inadvertent errors. (*Vickers v. Tyndall,* 168 Ill. 616.) It

has been the general practice of courts of review, when petitions for rehearing are presented, to pass only on points raised in the original briefs. Errors of record not argued are considered waived, upon the theory that if a party does not feel aggrieved by reason of an error the court will not be required to search the record for possible errors not raised. In *Hughes v. People*, 223 Ill. 417, it was held that an error which was not pointed out in the printed brief cannot afterward be raised either by reply brief, oral, printed argument, or on petition for rehearing.

We do not wish to imply that there is any merit to the criticism made of the instruction, but under the circumstances we feel that the settled rule should be adhered to. The petition is therefore denied.

*Petition for rehearing denied.*