(No. 14104.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PETE FRICANO, Plaintiff in Error.

*Opinion filed February 22, 1922—Rehearing denied April 5, 1922.*

1. CRIMINAL LAW—*meaning of statutory phrase, "in the peace of the people," in defining murder.* Where the question arises in the prosecution of a charge of murder, one is "in the peace of the people," within the meaning of that phrase as used in the statute, when he has done nothing to forfeit the right to live.

2. SAME—*when improper argument of State's attorney in murder trial is not ground for reversal.* Improper argument by the State's attorney in appealing to the jury for sympathy for the victim of the homicide in a murder trial is not ground for reversal of a judgment of conviction where the argument was evidently used in answer to a similar appeal by defendant's counsel for sympathy for the defendant, and where the court, on objection of defendant's counsel, stopped the argument along that line and disapproved of the remarks.

3. SAME—*when instruction does not assume facts.* Facts are not assumed in an instruction which requires them to be proved beyond a reasonable doubt before being considered as established.

4. SAME—*when giving instructions on subject of circumstantial evidence is not error.* Although the accused in a murder trial admits the killing and pleads self-defense it is not error to give instructions on the subject of circumstantial evidence, where there are facts in evidence concerning the conduct of the accused prior to the shooting which might be considered by the jury as furnishing the accused with an opportunity to arm himself and prepare for the assault as a matter of revenge.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN M. O'CONNOR, Judge, presiding.

FRANCIS BORRELLI, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (CLYDE C. FISHER, EDWARD E. WILSON, and HENRY T. CHACE, JR., of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Pete Fricano, plaintiff in error, was convicted in the criminal court of Cook county for the murder of Michael Banza and on April 14, 1921, was sentenced to the State penitentiary at Joliet for the term of his natural life. He has sued out this writ of error for a review of that judgment.

Michael Banza was killed by plaintiff in error on the morning of May 25, 1919, at about two o'clock, in the city of Chicago, in Cook county. He was about nineteen years of age, of medium build and weighed about 130 pounds. He was a native of Germany and came to this country when he was about three years old. The testimony showed that he had received two bullet wounds, one of which entered his body about four and one-half inches from the upper border of his lip. The other bullet perforated the left side of the neck, just at the point of the mastoid process, and severed all of the arteries in its course, and there were powder marks around the wound. The wounds caused almost instant death. Plaintiff in error is a native of Italy, forty-one years of age and weighed about 155 pounds. He came to this country when he was about twenty-three years of age, returned to Italy about nine years later and married there. He was employed by the Northwestern Railroad Company at the Great Lakes as a "straw boss" at the time of the homicide. His conviction was supported by two principal witnesses for the State, Frank Piotrowski and May McManon, or Mrs. May Shields, the former of whom testified, in substance, as follows: He is a machinist. He knew Michael Banza, and on the night of May 24, 1919, went with him to a dance given by the Deering Club, accompanied also by Martin Synkowiak. Near midnight they crossed the street to a saloon at 1735 Fullerton avenue. They had a drink at the bar and then went into the back room. He ordered everybody in that room, about fifteen or twenty, to have a drink, because he was a sport and be-

cause he wanted to do so, and he bought the drinks for the house.  He and his crowd were sitting at a table and he got acquainted with May McManon, Marie Johnson and Pete Fricano, who were sitting at another table, and this party all drank with him.  He never saw the girls before that night.  After he bought the drinks he sat down with the two girls and Fricano at their table.  Banza was standing by this table.  He had another bottle of beer while sitting at that table.  Fricano did not leave the table but the two girls went to the lavatory.  He was not invited there.  He just went over and sat down alone at the table, drinking.  Fricano said, "Don't interfere with my girl; you can have the other girl."  He told him he was not interfering with his girl.  Fricano called for a cab.  "We were going out to get into the cab.  When we left the table I discussed with May McManon about taking her home, and she asked me to come along, when we were in the saloon."  The girls got in the cab but Fricano did not want him and Banza to get in.  There were fifteen or twenty other people around there from the dance.  They were all pushing around there, and May McManon said, "Let's go."  Those people, about fifteen or twenty, came out of the dance pushing and crowding in.  Some of them were our friends and were pushing around trying to find out what was the trouble.  Fricano refused to admit Banza and him into the cab and did not want them to go.  Fricano was standing on the outside of the cab and the two girls were inside.  When Fricano called the cab he did not ask him to go along.  They had a little argument before Banza and he got into the cab.  He got into the cab because May McManon said that he could take her home, and Banza got in with him.  Banza said that he was going to stay with him.  Witness had some friends and he did not care what Fricano thought.  Fricano finally got into the cab and said, "Let's go."  He told the driver to go to Hobbie and Larrabee streets.  He then shook hands with the witness and said, "Let us be friends and not be

3( 2—19

sore about the conversation on the outside about getting into the cab." The five of them,—the two girls, Banza, Fricano and himself,—got out of the cab at Hobbie and Larrabee streets and the chauffeur drove away. Fricano suddenly walked off around the corner of Hobbie street and was gone about five minutes. He came back, caught hold of Marie Johnson and walked north on Larrabee street. Banza, May McManon and himself walked behind them about twenty-five feet and walked ten or fifteen minutes to Vedder and Frontier streets. They did not talk with Marie Johnson or Fricano, who was walking with and talking to her. From Vedder and Frontier streets Fricano walked off again and was gone about ten minutes. He and Banza stood talking with the girls. Fricano came back to the curb and said, "Hands up!" and fired a shot. Banza fell to the ground and witness turned around and ran away across to Reese and then to Halsted street. Banza and he both put up their hands when Fricano asked them to. There was no quarrel at any time between Banza and Fricano. Fricano did not tell them that the girls were his friends and for them to go about their business before he shot. He also stated that he was not drunk, but further stated that he was at the same saloon about 8:30 in the evening and drank whisky and a bottle of beer, but don't know what Banza drank. He and Banza were at this saloon about a half an hour. The killing occurred at about two o'clock in the morning.

May Shields testified that her maiden name was Mc-Manon. She was married in 1917 and had been separated from her husband about three weeks in May, 1919. She had known Marie Johnson about a year prior to May 24, 1919, but did not know Fricano until that night. Marie Johnson had an engagement with Fricano that night and she went with them to Riverview Park. They left the park for the saloon about 11:15 P. M. and went into the back room and were there altogether about an hour. There they

met Frank Piotrowski and Michael Banza at the table.  She had not known them before that night.  "They simply came to our table.  There was no trouble or argument at the table.  Pete called a Yellow cab and we left the saloon together,—Piotrowski, Banza, Marie Johnson, Fricano and myself.  I got into the cab first."  There were about five fellows got into an argument as to who were going to get into the cab,—the boy that was killed, Fricano, and two or three others.  They all wanted to get into the cab, and witness said, "If you are all going to get into this cab I am going to get out."  They stopped getting into the car, and that was when the argument started among Fricano, Banza and Piotrowski.  "I got into the machine, then Banza and Piotrowski and Marie.  I said, 'Let's go'."  Fricano got in.  Banza and Piotrowski were not invited to their table that night and she did not talk to them or did not know them.  Piotrowski talked about taking them home, and she just sat there, as it did not please her to have them come there without having been invited.  They did not get into the cab through any invitation.  They were driven to Hobbie and Larrabee streets.  Fricano paid the bill.  He said he was going to see a party and would be back and let them know if they were there.  When he came back he said the party was not at home, and further said, "Let us walk up north."  She corroborates Piotrowski as to the manner in which they walked to Vedder and Frontier streets.  At that corner they stood talking.  Fricano excused himself again, and while the four were there talking she had Banza by the arm.  When Fricano returned he said, "Hands up!"  Banza put his hands half way up and Fricano shot him and Piotrowski ran away.  He fired one shot at the boy that was dead and one at the boy running away.  The boy she had by the arm fell when Fricano fired, and she fell with him.  She testified that she drank four or five bottles of beer that night and nothing else.  She was taken in custody as a witness and did not see Fricano again until

she went down to identify him, about three weeks later. She made a statement to the police and was in custody of the police woman and was staying at her house at the time she was testifying. On cross-examination she testified that when she and Marie Johnson got into the cab she saw Banza, Piotrowski and five or six men trying to get in the cab, and that Fricano said, "You cannot come in here; I'll take these girls home." They were persistent about going along. She did not ask either of the men to go along.

Martin Synkowiak testified that he went into the back room of the saloon with Banza and Piotrowski when they went in there. It was after twelve o'clock and the front door was closed. Banza had a bottle of beer and some whisky. He heard Piotrowski say, "Let's all have a drink." Finally he sat down with Piotrowski at the table and they had two bottles of beer each, and after that went over to the table where Fricano and the two girls were. He had one drink at their table. He does not recall who paid for it. He did not hear Miss McManon say that Piotrowski could take her home.

A policeman testified that he searched the body of Banza at Vedder street and at the morgue and found no weapon on it. He did not look for a weapon particularly, only just where the body of Banza lay, and that others had been there before him.

Plaintiff in error testified, in substance, as follows: On the night of May 24, 1919, he got home from work about six o'clock, had supper and went to meet his girl, Marie Johnson. He had known her about three years. She asked him to take her and her friend, May Shields, to Riverview Park. They went and took in the shows. They left the park about 11:30 P. M. and went to the saloon aforesaid, where he had been once before with Marie Johnson. They went in and sat down in the rear at a table and had two drinks. Then three fellows came in. He heard them say, "Buy a drink for the house." He went to the toilet and

when he came back the three men were sitting at his table, and he asked Marie Johnson who called them, and she said nobody. Later he asked the bartender to get him a taxicab. The cab came and they went out to it. Banza, Piotrowski and others of their friends tried to get inside the cab. It didn't look good for them to get in his machine, and he told them he had girls and wanted to go. Then about a dozen fellows came and said, "Go ahead and get into the machine," and called him names. Marie Johnson said, "Come on and take them home." He didn't want any trouble, so he got into the machine. He sat in the back with the girls and Piotrowski and Banza sat in front. The two men said when they got in, "Pete, be quiet; come on,— be friends now." They all went to Larrabee and Hobbie streets and got out, and he paid the bill. Then the men started to walk to the corner, and he told them to go home,— that he wanted to take the girls home. "Then I said to wait there a few minutes and I come back. I start to walk east about one or two blocks to find a policeman. Then I come back and tell the fellows to go and leave. He says, 'All right,' and I go with Marie Johnson and these two fellows come. I start walking and the two fellows say, 'I go any place you go.' I go with Marie Johnson, and she say, "Pete, be careful of these people; they look for trouble; they said to me they can shoot better than the dago.' She said they told her that they had a gun just as good as the dago's. We walked north three or four blocks and she said they wanted to shoot me, and I says, 'Wait a few minutes and I'll be back.' I walked three or four blocks south, looking for a policeman. I cannot get any. Then I came back. All four was standing together. The man that was killed had his hand in his pocket, and Marie Johnson told me they had guns, so I said, 'Take your hands off from the pocket,' or, 'Hands out of pocket,' to one fellow, and he pulls something shiny off his pocket. Then I shot him. I shot twice.

When I shot twice I honestly believed that I was about to be killed. Then I went away to work again."

Plaintiff in error was arrested June 12 and was told that he was wanted at the East Chicago avenue police station. He told all that happened and about deceased having his hand in his pocket. When he saw the man with his hand in his pocket he was afraid. He told the officers that he fired the shots because he was afraid. On cross-examination he said he did not know whether Marie Johnson was married or not. He worked at Great Lakes eighteen months and before that at Jefferson Park, Park Ridge, and Milwaukee, Wisconsin. He lived at 1125 Cambridge avenue, two blocks from where the cab stopped that night. He got the gun at Green Bay, Wisconsin, and carried the gun when he thought he would be out late. On the night in question he had the gun in his pocket when he left the house, because he didn't know where he would be or what time he would get back. When they went out of the saloon that night the two girls got in the cab first. Piotrowski started to get in, and it seemed to him there were a dozen fellows there trying to get in. He did not want any trouble. He just said, "I don't want those fellows to get in." After they got into the car Piotrowski said, "Come, be good friends and shake hands." He shook hands with him. He guessed they first heard his name at the table in the saloon. He stopped the machine where they first got off because he did not want to go further. He had to go home, and he thought maybe they would stay on and not get off. He did not know where the police station was. When he got off the machine and paid the man he said to Banza and Piotrowski, "I go far; where do you go?" They said, "I go any place you go." He further testified: "After the shooting I went home. Banza didn't say anything to me. I told him to take his hand out of his pocket, because Miss Johnson said to me, 'Be careful by that fellow; he has got the gun.' I didn't see the fellows have a gun that night."

Piotrowski wanted to fight him before they got into the cab and said that he would not come into the car before he got him. "I said I didn't want to fight, and I asked him not to make trouble. I had the gun then. I fired twice right away. Don't know whether he fell or not."

Plaintiff in error proved a good reputation as a peaceable and law-abiding citizen and that he was a good worker and worked almost every day. The witnesses by which this testimony was established, twelve in number, were nearly all business men, one of the twelve being a policeman of Chicago. There was no evidence to the contrary. Several police officers testified as witnesses for the People that plaintiff in error made substantially the same statements to them after he was arrested that he made at the trial.

It is urged by plaintiff in error that the verdict in this case is not the result of a calm and careful consideration of all the evidence in the case but that it is the result of passion and prejudice on the part of the jury and is not sustained by the evidence. It is, perhaps, very truthfully said by him that had not the deceased and Piotrowski forced their attentions upon the two women at the saloon the death of the deceased would not have occurred. He also claimed that the deceased and Piotrowski were not in the peace of the people when at the cab door near the sidewalk when he refused to permit them to enter the cab and they still insisted on getting into it. It is true that their conduct at the saloon was very reprehensible, but the real question in this case is whether or not the defendant is guilty of the crime of which he was convicted, and this question is to be determined mainly upon the facts that occurred at and just previous to the killing. The evidence of the two prosecuting witnesses who were eye-witnesses to the killing is substantially the same, and if the jury believed their testimony, as they must have done, the jury were warranted in returning the verdict of guilty. Under their testimony the deceased at the time he was killed had not done and was

not doing anything that warranted the defendant in shoot-
ing him. This court has frequently ruled that one is in
the peace of the people, within the meaning of that phrase
as used in our statute, when he has done nothing to for-
feit the right to live, where that question arises in a case
of homicide. The fact that no revolver was found on or
about the deceased after he was killed, and that there is no
evidence of any kind to substantiate the claim of defend-
ant that the deceased had anything in his hand whatever,
tended to corroborate the testimony of the two prosecut-
ing witnesses, and this court cannot say from the evidence
that the verdict of the jury is not amply supported by
the record evidence. No matter how provoking the con-
duct of the deceased and Piotrowski may have been up to
the time of the killing, the defendant had no right to kill
the deceased except in his necessary or apparently neces-
sary self-defense. The most provoking part of their con-
duct occurred at the saloon, and at the time the killing took
place neither Banza nor Piotrowski was doing anything, ac-
cording to the testimony of the two prosecuting witnesses,
that warranted the defendant in believing that he was in
danger of losing his life or of suffering great bodily harm.
The defendant had apparently made up with Banza and
Piotrowski and had shaken hands and all had agreed to be
friends. This he admits himself. He had ample time be-
fore the killing took place to fully reflect over their mis-
doings that had occurred at the saloon, and the necessary
conclusion must be either that the killing was murder or
was done in self-defense,—that is to say, it was a killing
in a revengeful spirit by the defendant and at a time when
his passions had had ample time to cool, or it was a kill-
ing in his necessary or apparently necessary self-defense.
The jury were particularly called upon to settle these ques-
tions, and their verdict cannot be set aside by this court on
the ground that it is not supported by the evidence.

It is true, as claimed by the defendant, that the fact that a man has all his life maintained a good reputation for honesty and integrity and been a peaceable and law-abiding citizen may be sufficient, in a doubtful case, to raise a reasonable doubt of his guilt when accused of crime. The defendant had the benefit of all the testimony of this character that was given by the twelve witnesses who testified as to his character and reputation, and the jury were fully and correctly instructed by a number of instructions as to what weight should be given to such testimony. It may be further said that there were no facts and circumstances in this case tending to show that Banza or his friend were molesting or maltreating the two women who were with them at the time of the killing, and that the defendant was at no time called upon by them to protect them from any supposed misconduct on the part of the two men. In fact, the jury were warranted in believing that the motive for the killing was purely for revenge because of the forced attentions of the two men upon the two women, which was apparently little resented by them. Therefore the claim of the defendant that there was no motive for the killing need not further be discussed. The defendant placed his defense upon the only ground that could possibly be sustained, self-defense.

Prejudicial remarks by the State's attorney are insisted upon as reversible error. It appears from the record that the attorney made these remarks in answer to a special appeal to the jury by the defendant's attorney for sympathy in behalf of the defendant. What that appeal was does not appear in the record. The answer of the attorney for the State to that appeal, and which is complained of particularly as being prejudicial, is in these words: "Now, during that appeal he was simply going along on the theory he was going to try to sway and influence you men; to establish some sort of sentiment for this fellow,—of pity in your hearts; and as he was talking the thought came to

me of that boy that was killed that until now there hasn't been one word spoken in behalf of the deceased; and the thought came to me that you men had promised you were not going to be swayed by sympathy; but I do say to you that if you are going to have any sympathy in this case, if you are going to give vent to a sigh of sorrow, give it to that eighteen-year old boy who is now six feet under the ground." On objection to these remarks the court promptly disapproved of them and said, "We don't want to go into that at all," and so far as the record shows that was the end of any further appeal of that character. We do not think these remarks furnish sufficient ground for reversal.

Many objections are urged to the instructions given on the part of the People, and also to the action of the court in refusing a number of instructions offered for the defendant bearing upon the law of self-defense. We have given full consideration to the instructions, both the given and the refused. The law of self-defense, in every phase of it, was laid down by the instructions given, and the objections to the instructions given on the part of the People cannot be sustained. It is said that many of the People's instructions assumed many of the facts recited therein. We find on examination of the same that the jury were required by those instructions to find that the facts recited and said to be assumed should be found by the jury to have been proved beyond a reasonable doubt. Facts are not assumed when they are thus required to be proven beyond a reasonable doubt before being considered by the jury as established. Several instructions were refused that were offered by the defendant on the law of self-defense. A few of them state the law correctly, but all the principles therein contained were announced in other instructions given by the court.

It is argued by the defendant that the court committed error in giving two instructions for the State bearing upon the law of circumstantial evidence. The ground of the ob-

jection is that there was no circumstantial evidence intro-
duced in the case, and that such instructions have no proper
place in the record and should not have been given. This
contention cannot be sustained. We need only call atten-
tion to the fact that the defendant lived within two blocks
of the corner where the taxicab unloaded all five of the
people who were present at the killing, and that the de-
fendant had the chauffeur stop there,—a point at a consid-
erable distance, as appears from the record, from the place
where Marie Johnson lived. This is the place where the
defendant first left the two women and the two men and
was gone five minutes,—after a policeman, as testified by
him. He left the parties afterwards at another point and
was gone for ten minutes, as he contends, upon the same
errand,—hunting for a policeman. There is some evidence
in the record that he made the claim that night that he
was hunting a place, a party who would furnish them a sup-
per. He apparently had ample time to go home for his gun
or to look for friends who would aid him in his expressed
intention of having the two men leave and not give him
and the two women further attention or trouble. It was
proved, also, by one of the police officers that that neigh-
borhood is an Italian neighborhood. These facts, together
with the fact that defendant made two claims as to his ob-
ject or purpose in leaving the parties, furnished ample rea-
son for giving the instructions complained of, to say noth-
ing about the information given him by Marie Johnson, as
he claimed, that the two men had guns and would give
him trouble.

It is very unfortunate that defendant, a man of good
repute and in good standing, met the rough and rowdy
crowd whom he and his companions met at the saloon and
that he got into the unfortunate trouble that resulted in the
killing. The unfortunate situation in which the defendant
now finds himself is one that naturally calls for more or
less sympathy for him, but the motives that led to his leav-

ing his home and his family that night were certainly not of the most commendable sort. All the evidence in the case tends to show that in all probability there was an illicit relation existing between him and Marie Johnson. He called her his girl, and his bitter resentment against the two offending parties was because of the fact that they were interfering with him and this girl and apparently trying to take her away from him. He went to a place where he might expect just such treatment at the hands of roughs who were moved by motives similar to those of his own.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*