(No. 35513.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MILLARD FORD, Plaintiff in Error.

*Opinion filed June 14, 1960.*

Harold G. Baker, Jr., of East St. Louis, for plaintiff in error.

Grenville Beardsley, Attorney General, of Springfield, and Byron L. Connell, State's Attorney, of Mound City, (Fred G. Leach, Assistant Attorney General, of counsel,) for the People.

Mr. Justice Daily delivered the opinion of the court:

Millard Ford, defendant, was indicted for the fatal shooting of Walter Unger, and after a jury trial in the circuit court of Pulaski County, was found guilty of murder and sentenced to the penitentiary for a term of 99 years. Upon writ of error he now contends (1) that the trial court improperly allowed private counsel to assist in the prosecution of this case, (2) that the selection of jurors was contrary to statute, (3) that the trial court erred in permitting the testimony of a prosecution witness whose name had not appeared upon the indictment prior to trial, (4) that certain given instructions were improper and prejudicial, (5) that the conduct of certain officials and jurors during trial was prejudicial, and (6) that the verdict of guilt was not supported by the evidence.

The shooting occurred between 3:30 and 4:00 A.M. on the morning of October 22, 1951, at Tiny's Place, a roadside tavern located near Mound City. Hazel Jordan, operator of the nearby Sunny Dell tavern at which Unger was employed as a bartender, testified that at about 3:00 A.M., defendant, in the company of his wife, entered her establishment and soon became involved in an argument with Unger during which defendant used obscene language

and threatened to kill the latter whereupon Unger led him to the door and ordered him to leave the premises. Soon thereafter, being between 3:30 and 3:45 A.M., the tavern closed and Unger, driving alone in his panel truck, proceeded toward Mound City. This witness further related that Unger and defendant had known each other for approximately two years, that defendant frequently visited her tavern, and that only a few nights before the shooting she herself had hit defendant over the head with a serving tray during an argument.

Imon Goins, a taxi driver, verified the fact that Unger had led defendant to the door and "spun" him from the Sunny Dell tavern following an argument between the pair, during which each threatened to kill the other, and further related that before proceeding towards Mound City in his automobile, defendant, who was intoxicated, asked Goins to tell Unger that he was going home for a gun to kill the latter. Upon being informed of this threat, Unger removed a gun from a drawer and laid it beside the cash register, after which Hazel Jordan, the proprietor, telephoned someone and then ordered the tavern closed. Goins then left the premises in his cab, and as he passed Tiny's Place on his way to Mound City, he noticed defendant's wife sitting in their automobile which was parked near the road some sixty feet from this tavern.

The People also produced John Flanders, a bartender at Tiny's Place, who told of the events leading up to the killing. According to his account, defendant entered this second tavern sometime after 3:30 A.M with his wife and asked Flanders for a gun "to protect some whiskey," whereupon the bartender went into a back room, got a gun from another patron, and sold it to defendant for fifty dollars. Upon discovering the gun was empty, defendant asked for and was given five shells but they were not immediately placed in the gun. Defendant's wife left the tavern alone and he followed shortly thereafter, but as he did so, Flan-

ders stepped into the back room and did not see or hear the actual shooting.

Another bartender at Tiny's Place, Robert Phillips, testified that after defendant and his wife entered the tavern he heard defendant ask for some shells. As related by this witness, the wife stayed in the tavern a very short time but defendant remained for some fifteen minutes before he and another customer, Joe Barnett, left together. Very shortly the latter returned to the tavern alone, and as he did so, the witness, through a large picture window at the front of the tavern, observed defendant fire three revolver shots from a standing position, heard two more shots, and then saw defendant enter the automobile where the wife was waiting.

Joe Barnett, another prosecution witness, recalled talking with defendant at Tiny's Place prior to the shooting, at which time defendant, who had been drinking heavily, allegedly told Barnett that he was going to kill Unger and produced a gun to emphasize his threat. Barnett attempted to reason with defendant and even offered to drive him home but to no avail whereupon both left the tavern together. As they did so, according to the witness, Unger's truck pulled off the highway into the parking area in front of the tavern, and defendant warned Barnett to get inside. Upon entering the tavern, Barnett heard five shots and then through the tavern window, saw defendant get into his car and drive off. When the witness returned outside he observed Unger lying face down upon the ground.

Another tavern patron, Edgar Terrell, told of hearing the five shots and particularly noticed a hesitation between the third and fourth. Dr. Grossman, a pathologist, testified that five bullets struck Unger, one of which entered the back of his head, another the chest, a third entered the front of the left thigh, a fourth the lower back, and the fifth struck the abdomen. It was the witness's opinion that the bullets entering the thigh, chest, and abdomen traveled

horizontally but he could not determine the course of the other two projectiles. Carl Alstat, a Mound City undertaker, was of the opinion that the bullet entering the thigh had traveled an upward course, that the one striking the abdomen had followed a horizontal line, and that the three remaining shots traveled a downward course. It was stipulated that the gun purchased by defendant at Tiny's Place was the lethal weapon and that, following the shooting, it was found by the side of a blacktop road some five or six miles away.

Defendant admitted he fired the fatal shots but insisted it was done in self-defense. According to his version, Unger was a vicious individual who at all times carried a gun and had, on at least two prior occasions, beaten defendant with a black-jack following arguments over gambling debts. About October 1, 1951, Hazel Jordan, who employed Unger, suggested that defendant meet her in Chicago, but when he refused and threatened to tell her husband, Jordan struck defendant over the head with a serving tray and promised to "get even" anyway she could. As further related by defendant, a few nights later while at the Sunny Dell tavern, Hazel Jordan asked defendant to tell her husband that no such proposals had in fact been made and when he refused this request, she again threatened him. On the day before the shooting, being about 10:00 A.M. on October 21, 1951, Unger visited defendant at the latter's shop in Mound City and threatened to kill him unless he told Hazel Jordan's husband that there was no truth to his earlier statement, whereupon defendant promised to go to the tavern that same evening and so tell the husband. Ford closed his shop between 12:30 and 1:00 A.M. the morning of October 22, and together with his wife proceeded towards the Sunny Dell tavern, stopping however for two drinks on the way. They arrived at their destination about 3:00 A.M. only to find the husband already in bed, and shortly thereafter defendant became involved in

a bitter argument with Unger which resulted in his being thrown out the door amidst threats by Unger that he would kill defendant even if he had to follow him all the way home. Defendant denied telling Goins, the taxi driver, of his intention to kill Unger but insisted he had told Goins to inform Unger that he would tell Hazel Jordan's husband anything Unger desired. Thereafter, according to defendant, he and his wife drove to Tiny's Place where he acquired a gun and shells from the bartender "to get some protection." His wife left the tavern first and waited just outside the front door in a weather-protector type entrance way until he joined her a few minutes later, but as they both stepped from the entrance way into the parking area Unger suddenly appeared, threatened to kill him, knocked him down, grabbed both his feet, and proceeded to drag defendant on his back across the ground for a distance of eight to ten feet before defendant was able to free his left foot. This, continued defendant, made Unger furious, and as Unger started to reach into his pocket, defendant drew his own revolver and from a prone position fired five shots at Unger as fast as he could pull the trigger whereupon Unger fell forward and across defendant's right leg. After freeing himself, defendant recalled he walked to his car where his wife was waiting, drove to Mound City to find the town marshal but without success, and then proceeded to drive home, stopping enroute to throw the gun away. He insisted he did not see either Joe Barnett, Edgar Terrell, or Robert Phillips at Tiny's Place the night of the shooting, and said that prior to the shooting he had consumed only three drinks and three beers.

Mable Ford, defendant's wife, corroborated her husband's account and insisted that although she left Tiny's place a minute or so before her husband and waited for him in the outside weather protector, neither knew Unger was around until he grabbed defendant. Jess Buchanan, a defense witness, testified that he was present when Unger

came to defendant's place of business on the morning of October 21, and several other witnesses testified that Unger was a strong and vicious man. Dillion Potts and Orville Bledsoe testified that they were drinking together that morning and at about 3:30 A.M. or 4:00 A.M. they stopped their car just off the highway in front of Tiny's Place and observed Unger strike defendant as he and his wife left the tavern, but they immediately proceeded down the road and did not see or hear any shooting.

At the trial, Peyton Berbling, an attorney and resident of a neighboring county, appeared with the Pulaski County State's Attorney in prosecution of this case and was compensated partially by Unger's widow and partially by the State's Attorney. We see no error in this regard inasmuch as we have consistently held that a trial court, in its discretion, may permit a privately employed attorney to assist the State's Attorney in the prosecution of a criminal case so long as the defendant is adequately represented, and have held the statute prohibiting a State's Attorney from receiving any private reward for performing official duties (Ill. Rev. Stat. 1951, chap. 14, par. 7,) is not applicable to this situation. (*Hayner* v. *People,* 213 Ill. 142; *People* v. *O'Farrell,* 247 Ill. 44; *People* v. *Strosnider,* 264 Ill. 434; *People* v. *Kingsbury,* 353 Ill. 11; *People* v. *Stark,* 324 Ill. 289; *People* v. *Donaldson,* 255 Ill. 19; *People* v. *Hartenbower,* 283 Ill. 591; *People* v. *Miller,* 13 Ill.2d 84.) From the record it appears that defendant was represented by an experienced and able attorney of his choice and was not prejudiced by the presence of privately employed counsel. Although defense counsel initially objected to the appearance of Berbling, it appears that the objection was for the purpose of determining if any of the jurors had contributed towards his employment and was not directed against his participation in the case as special prosecutor.

Defendant next contends that the selection of jurors was contrary to statute, and in support therof, states that

names were placed in the jury box before prior names had been exhausted, that the sheriff had not served all persons on the prior venires before the fourth special venire was called, and that the court ordered the summoning of bystanders to complete the jury rather than an eighth special venire. The first objection, although initially raised by defense counsel at the time of trial, was later withdrawn by him and is not before us at this time. It appears that it took nine days to complete the jury during which time some seven hundred persons were summoned for jury duty. Nevertheless, upon hearing of defense counsel's motion to quash the fourth special venire, it developed that a small number of those individuals named on the prior venires had not been found, and in a few instances, the sheriff had made only one attempt to determine their whereabouts. The statute (Ill. Rev. Stat. 1951, chap. 78, par. 11,) states that the sheriff shall summon each of the persons whose names have been drawn for jury duty and provides for a monetary fine should he fail to exercise proper diligence in this regard. Under the facts of this case it cannot be said that this duty was violated. Furthermore, there is nothing to show that defendant was in any way prejudiced by the failure to summon these particular individuals and the matter was not assigned as error in defendant's written motion for a new trial. (*People* v. *Anderson,* 406 Ill. 585; *Wilhelm* v. *People,* 72 Ill. 468; *People* v. *Vickers,* 326 Ill. 290.) As to the summoning of bystanders, it appears that the regular panel, the special panels, the county jury box, and the master list were exhausted when the court ordered the sheriff to summon thirty additional persons from the body of the county to fill the panel for this particular case, and upon defense objection to the sheriff acting in this capacity, two bailiffs were sworn to discharge the duty. We believe this was proper under the circumstances of this case. Our statute in this regard (Ill. Rev. Stat. 1951, chap. 78, pars. 12 and 13,) authorizes the summoning of such

individuals by the sheriff when necessary to complete a jury for a particular cause, and further provides for the appointment of bailiffs should objection be made to the sheriff's participation. *People* v. *Bedard,* 11 Ill.2d 622.

Further objecting to the jury, defendant argues that he was prejudiced by the fact that the first eight jurors accepted were Negroes, by improper remarks made by the State's Attorney during the *voir dire,* and by the length of the *voir dire* itself. It is true that the first eight jurors picked in this case were Negroes, and that after two of those jurors had expressed reluctance about serving upon an all colored jury and the defense counsel had asked that Negroes be excluded from the third jury panel, the court sustained the defendant's motion and thereafter only white jurors were accepted. We fail, however, to see how defendant was prejudiced by this action. Since the record does not indicate that he exhausted his peremptory challenges, he was as much responsible for picking the first eight jurors as was the People, and the remaining jurors were selected in accordance with his own request. We have frequently stated that a defendant, having failed to use his peremptory challenges, is in no position to complain concerning jury selections. (*Siebert* v. *People,* 143 Ill. 571; *Wilson* v. *People,* 94 Ill. 299; *Ochs* v. *People,* 124 Ill. 399.) Furthermore, there being no evidence of any attempt to systematically exclude white jurors as such, it cannot be said that defendant was denied any constitutional rights in this regard. (*Eubanks* v. *State of Louisiana,* 356 U.S. 584, 2 L. ed. 2d 991.) Following defense counsel's oral motion for exclusion of further Negro jurors, during which time, in their presence, the defense counsel indicated he was acting to protect the jurors from embarrassment, the State's Attorney remarked: "We are the judges of whether people are embarrassed or not. It is very strange we have developed an interest insofar as knowing whether people have sense enough to know what they are doing or not."

The statement, although ill-advised, was prompted by and in opposition to defendant's stated position, and was objected to, not at the time it was made, but after considerable evidence was heard upon defendant's motion. Under these circumstances, a reversal upon this point is unwarranted. (*Clark* v. *People,* 224 Ill. 554; *People* v. *Munday,* 280 Ill. 32; *People* v. *Fricano,* 302 Ill. 287.) Neither during the trial itself nor in his post-trial motion did defendant urge error resulting from the duration of the *voir dire,* and we know of no instance in which that alone has been considered as prejudicial error.

The defendant also contends that the lower court erred in permitting the testimony of Robert F. Phillips, whose name had not appeared upon the indictment prior to trial. At the time of arraignment on May 6, 1952, defendant was furnished a copy of the indictment bearing the names of various prosecution witnesses, and on May 13 the People asked to have the names of Robert Phillips and Edgar Terrell also endorsed upon the indictment. Before ruling on the matter the court directed the witnesses to appear for examination, and prior to trial on May 16, a hearing was had at which time it developed that although the sheriff of Pulaski County had some three or four days before arraignment been advised that Phillips was an eyewitness, neither the State's Attorney nor the special prosecutor were aware of this fact until May 13 when the matter was called to the court's attention. In allowing the People's request the court said: "I am going to endorse the witness' name . . . but when it comes time for the defense to meet it, I am going to give you whatever time you need to try to combat it." Phillips testified in this cause on the morning of May 17 after which the court adjourned until May 19, as the docket entry states, "to give the defendant time to prepare defense as to Robert Phillips and other witnesses." At the same time the defendant was granted leave by the court "to cross-examine and prepare to defend

on the testimony of Bobbie Phillips all the way through the procedure of this trial and up until the defense does close." It does not appear that defense counsel thereafter made any request for further delay or intimated that additional time was needed to combat this testimony. Rather, the record indicates that defense counsel knew of Phillips's existence prior to trial and in fact interrogated him on May 6, 1952, although counsel insisted that the information then volunteered by Phillips differed materially from that given at the time of trial. We have on many occasions pointed out that the purpose of informing defendant concerning prosecution witnesses is to prevent surprise and afford him an opportunity to combat false testimony, and that a court may, in its discretion, allow witnesses to testify whose names do not appear on the indictment when such does not place the accused at an unfair disadvantage, the burden of establishing this unfairness being upon the defense. (*People* v. *Quevreaux,* 407 Ill. 176; *People* v. *Strosnider,* 264 Ill. 434; *Gore* v. *People,* 162 Ill. 259; *People* v. *Weil,* 243 Ill. 208; *Kirkham* v. *People,* 170 Ill. 9.) In *People* v. *Corder,* 306 Ill. 264, defendant was furnished a "complete" list of witnesses on March 15, a second list on April 14, and a third list on April 29; yet at the trial commencing on May 2 all these individuals were allowed to testify. Similarly, in *People* v. *Kemp,* 396 Ill. 578, a witness was permitted to testify despite the fact that his name was not endorsed on the indictment until after the parties had announced they were ready for trial, and in *People* v. *Weisberg,* 396 Ill. 412, we held that the withholding of names of some prosecution witnesses until trial did not constitute reversible error. In the present case defendant's counsel talked with Phillips some ten days before he testified, was formally advised of the People's intention to call him four days before he took the stand, was allowed to examine the witness the day before, was given a day and a half after he testified to further investigate the matter,

was permitted to cross-examine Phillips at any time during the trial, and was informed that the defense would be allowed all the additional time necessary to combat this evidence. Upon the facts it cannot be said that defendant was unduly surprised or that the lower court erred in permitting Phillips to testify.

Complaint is also made of certain instructions which were given in this case, but neither the abstract nor the record itself indicates by whom they were tendered. Since a person should not profit by his own error, we have consistently refused to consider instructions which are unlabeled as to source, (*People* v. *Mikka,* 7 Ill.2d 454; *People* v. *Kemp,* 396 Ill. 578; *People* v. *Vickers,* 326 Ill. 290,) and we would be warranted in so acting herein. Nevertheless, in order to remove any question of error, we have carefully examined the matter and find that the instructions submitted to the jury, when taken as a series, properly state the principles of law applicable to the present situation. *People* v. *Quevreaux,* 407 Ill. 176.

In support of his contention that prejudicial error occurred during the trial of this case, defendant complains that a State highway patrolman was allowed to sit in the jury box for at least an hour, that a bailiff mocked certain defense witnesses while they were testifying, that the sheriff and other police officers were permitted to sit within the bar of the court, that commercial gamblers were in evidence throughout the courthouse, that members of the jury were inadequately quartered and on occasions during the trial talked with the sheriff and the State's Attorney, and that one of the jurors, prior to being called for jury duty, expressed his opinion of guilt and agreed that defendant should receive a 99-year penitentiary sentence. With the exception of the latter, all of these acts were supposedly observed by defendant during the course of the trial, yet not once did he call these matters, or any of them, to the attention of the court. An accused may not sit idly by and

allow irregular proceedings to occur without objection and afterwards seek to reverse his conviction by reason of those same irregularities. (*Bruen* v. *People*, 206 Ill. 417; *People* v. *Nachowicz*, 340 Ill. 480; *People* v. *Heine*, 377 Ill. 134.) As to the latter complaint, it is sufficient to say that a previously expressed opinion is not an absolute bar to jury service, (*Cooke* v. *People*, 231 Ill. 9; Ill. Rev. Stat. 1951, chap. 78, par. 14,) and where, upon *voir dire* examination, an individual states his ability to render an impartial decision, it is for defendant, in the first analysis, to decide whether the juror is qualified to act, and having decided this question in the affirmative, as in the instant case, he may not later change his mind in the hope of setting aside an adverse verdict. (*People* v. *Conners*, 246 Ill. 9.) It is our opinion that no prejudicial error occurred in the conducting of these trial proceedings.

Finally, we must consider whether the verdict rendered was supported by the evidence. It was admitted by defendant that he quarrelled with Unger shortly before the shooting, that he purchased the gun and shells at the scene of the crime, that he fired the fatal shots, that he fled immediately thereafter, discarded the weapon a short distance away, and was later arrested at his home. He testified, however, that he had not threatened Unger's life and had killed the latter only to protect himself, but this account was contradicted by Hazel Jordan, who allegedly heard such threats; by Imon Goins, who swore he heard defendant's threats and saw defendant's wife sitting alone in their automobile in front of Tiny's Place prior to the shooting; by Robert Phillips, who stated he saw defendant fire while standing some distance away from the intended target; by Joe Barnett, who repeated defendant's threats to kill Unger and supposedly left the tavern with defendant, thus contradicting his testimony that the wife was waiting for him just outside the door; and by the medical testimony which indicated that the shots generally traveled either a hori-

zontal or downward course rather than the upward course which would normally be expected if the gun was fired, as defendant claimed, from a prone position. When the evidence is conflicting, as in the present case, it is for the jurors who have personally seen the witnesses and heard their testimony to determine the weight it should be accorded, and their verdict will not be disturbed upon review unless the evidence is so improbable as to justify a reasonable doubt of guilt. (*People* v. *Quevreaux,* 407 Ill. 176; *People* v. *Scott,* 261 Ill. 165.) After carefully examining the record we cannot say that such doubt exists in the instant case.

The judgment of the circuit court of Pulaski County is therefore affirmed.

*Judgment affirmed.*